**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>ROBERT CEPHAS BROWN, JR.,<br>*Defendant-Appellant*. | No. 12-10227<br><br>D.C. No.<br>2:09-cr-00074-JAM-1 |
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>DUANE ALLEN EDDINGS,<br>*Defendant-Appellant*. | No. 12-10230<br><br>D.C. No.<br>2:09-cr-00074-JAM-2<br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
September 8, 2014—San Francisco, California

Filed November 7, 2014

Before: Carlos T. Bea, Sandra S. Ikuta,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

## SUMMARY*

### Criminal Law

The panel affirmed Duane Allen Eddings's convictions, affirmed in part and vacated in part the district court's sentencing determinations concerning Eddings and Robert Cephas Brown, Jr., and remanded for resentencing in a case arising from a Ponzi scheme and bankruptcy fraud.

The panel held that the district court's denial of the government's motion pursuant to U.S.S.G. § 5K1.1 to reduce Brown's sentence on account of his assistance was proper, and that Brown's 188-month sentence is not substantively unreasonable.

Regarding Eddings's mail fraud charges related to bankruptcy fraud, the panel held that even assuming Eddings was charged under an improperly overbroad theory of defrauding the bankruptcy court and trustee in addition to creditors, there was no plain error because he was tried under the valid theory that he committed mail fraud by filing schedules that failed to disclose certain assets and artificially inflated his debts in order to enable him to obtain a "no asset discharge" without paying his creditors, and the government never argued that the bankruptcy court or the trustee was defrauded.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that there was sufficient evidence to support Eddings's convictions on Ponzi scheme mail fraud charges.

The panel held that Eddings's bankruptcy fraud convictions were properly grouped for sentencing with his Ponzi scheme convictions pursuant to U.S.S.G. § 3D1.2(d).

The panel held that application of a leadership role adjustment to Eddings's sentence pursuant to U.S.S.G. § 3B1.1(c) was erroneous, where the district court noted that it was not "really made clear" whether Eddings controlled a particular participant, and the record does not indicate that he controlled any other criminally responsible participant in the scheme.

The panel held that the district court erroneously imposed on both defendants an enhancement under U.S.S.G. § 2B1.1(b)(15)(B)(iii) for endangering the solvency or financial security of 100 or more victims, where the government did not provide evidence of the impact of the crimes on the requisite number of victims. The panel left it to the district court to decide whether to take new evidence on this adjustment on remand.

The panel held that increasing Eddings's sentence under U.S.S.G. § 2B1.1(b)(2)(C) for having 250 or more victims was erroneous, where the district court relied on 148 victims who were not included in the loss calculation under U.S.S.G. § 2B1.1(b)(1).

The panel rejected the defendants' arguments that remand should be to a new judge.

**COUNSEL**

Heather Williams, Federal Defender, David M. Porter (argued), Assistant Federal Defender, Rachelle Barbour, Research and Writing Attorney, Sacramento, California, for Defendant-Appellant Robert Cephas Brown, Jr.

John Balazs (argued), Attorney at Law, Sacramento California, for Defendant-Appellant Duane Allen Eddings.

Benjamin B. Wagner, United States Attorney, Camil A. Skipper, Appellate Chief, Michael D. Anderson (argued) and Todd A. Pickles, Assistant United States Attorneys, Sacramento, California, for Plaintiff-Appellee.

**OPINION**

HURWITZ, Circuit Judge:

Indicted for operating a Ponzi scheme, Robert Brown pleaded guilty to one count of wire fraud. His partner in the scheme, Duane Eddings, proceeded to trial and was convicted of six counts of mail fraud, one count of wire fraud, three counts of money laundering, and three counts of tax evasion. Some of Eddings's convictions arose from the Ponzi scheme and others from a bankruptcy fraud. Brown appeals his sentence; Eddings appeals his convictions[1] and sentence.

---

[1] Eddings does not challenge his convictions on one count of mail fraud (count 2), one count of wire fraud (count 7), and three counts of money laundering (counts 8–10).

We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, vacate in part, and remand for resentencing.

## I. Factual Background

### A. The Ponzi scheme.

In 2000, after a Vallejo, California newspaper article touted Robert Brown's investment capabilities, he organized a public seminar. Some attendees requested that Brown invest for them, and he agreed to do so. Unfortunately, Brown invested only some of the investors' money and took the rest "off the top" for his own use. Brown's investments were initially successful enough to mask his wrongdoing, but they soon turned south.

Brown then began a classic Ponzi scheme: he would "lie to [investors] and make them feel that everything was still going well," and use money from new investors to pay off past investors. Brown told investors he felt "blessed" by his ability to generate returns to "give back to the community." He also told investors he would not take management fees; rather, one hundred percent of their funds would be invested, and he would be paid only after he doubled their money.

Duane Eddings had seen Brown driving around town in his Ferrari and had wanted to meet him for some time. In the summer of 2005, Eddings introduced himself to Brown. The meeting was fortuitous, because Brown was then "desperate for new money." Brown and Eddings promptly established a "business relationship" under which Eddings brought in new investors for "15 or 20 percent of the new money."

At Brown's instruction, Eddings opened up separate bank accounts to keep the investors he recruited apart from Brown's; one account was for "WISE Investors." Soon after their relationship was established, Eddings became aware of the Ponzi scheme. By September 2005, Brown was sending "lulling letters" to investors, "trying to basically stall people, hoping that they wouldn't go to the authorities." Brown testified that Eddings "was getting people complaining to him" about their investments and that the two talked about "what was going to go into the letters." Bank records showed that in November 2005 Eddings deposited new investor funds into his WISE Investors account and then immediately used that money to pay old investors.

Brown and Eddings jointly solicited new investors through seminars at a Berkeley restaurant; Brown was the primary presenter and Eddings was responsible for the "finance and the contracts." Generally, Eddings transferred funds from his account to Brown's to pay Brown's investors; at least once, however, Eddings paid Brown's investors directly from his WISE Investors account.

Over time, it became increasingly difficult to pay investors, and Eddings complained to Brown about needing money to "pay some of his own bills and a credit card he had got behind on." Brown agreed to increase Eddings's "referral fee" to fifty percent of the funds Eddings obtained.

From 2005 to 2007, Eddings personally received over $1,866,000 from the WISE Investors account. Approximately 165 investors deposited funds into that account. The last transfer of money from the WISE Investors account to Brown was on May 22, 2007. Brown continued

the Ponzi scheme thereafter, taking in several hundred thousand dollars in 2007.

## B. Eddings's bankruptcy fraud.

On September 30, 2008, Eddings filed a Chapter 7 bankruptcy petition. Eddings's bankruptcy filings and tax returns claimed little or no income for 2005 to 2007; his bankruptcy schedules listed total assets of only $33,000. The petition claimed a fictitious $2.5 million loan from Brown as Eddings's largest debt. In light of the filings, the bankruptcy trustee abandoned any effort to obtain a recovery for creditors. Eddings received a discharge on January 5, 2009.

## II. Procedural Background

## A. Brown's plea; Eddings's trial.

In February 2009, Brown and Eddings were indicted in the Eastern District of California on four counts of mail fraud, 18 U.S.C. § 1341, eight counts of wire fraud, 18 U.S.C. § 1343, and ten counts of money laundering, 18 U.S.C. § 1957. In April 2010, Brown pleaded guilty to a single count of wire fraud and agreed to testify against Eddings. In exchange, the government agreed to dismiss the remaining counts of the indictment, seek a sentence at the low end of the Guidelines range, and recommend reductions for acceptance of responsibility and cooperation.

On May 12, 2011, the government filed a superseding indictment against Eddings. It included three new charges of tax evasion, 26 U.S.C. § 7201, arising from the returns he filed during his bankruptcy. In October 2011, the district court dismissed two of the wire fraud counts as beyond the

statute of limitations.  Eddings then was tried; the jury found Eddings guilty on all remaining counts.

### B.  Brown's sentencing.

#### 1. Government's motion under U.S.S.G. § 5K1.1 and application of 18 U.S.C. § 3553(a) factors.

The government filed a United States Sentencing Guidelines Manual (U.S.S.G.) § 5K1.1 motion, seeking to reduce Brown's sentence to 100 months because of his assistance.  The district court acknowledged that Brown "did cooperate" and "accepted responsibility," but found the government's proposed 100 month sentence "too great of a reduction."

The court then analyzed the "[18 U.S.C. §] 3553(a) factors."  The judge concluded that Brown was still "a danger to the public given the depth and length of this scheme" and that "a lengthy sentence [wa]s necessary . . . to protect the public from further crimes of this defendant."  Although the court credited Brown for accepting responsibility and assisting the government, he found that after application of the § 3553(a) factors, "it basically [was] a wash."  The court denied the § 5K1.1 motion under these "unique circumstances," and sentenced Brown to 188 months, a within-Guidelines sentence at the top of the range.[2]

---

[2] The district court reduced Brown's offense level by three levels for acceptance of responsibility under U.S.S.G. § 3B1.2(b).

## 2. Increase under U.S.S.G. § 2B1.1(b)(15)(B)(iii)[3] for "endanger[ing] the solvency or financial security of 100 or more victims."

The pre-sentence report (PSR) suggested that Brown's sentence should be increased by two levels[4] under U.S.S.G. § 2B1.1(b)(15)(B)(iii) because the "offense substantially endangered the solvency or financial security of 100 or more victims." Brown timely objected, arguing that the government had failed to specifically identify 100 such victims. The court overruled the objection, finding that the "information that probation ha[d] before it" was sufficient to establish by a preponderance of the evidence that "there were at least 100 victims whose solvency was endangered."

---

[3] The current (2013) version of the U.S.S.G. numbers this provision § 2B1.1(b)(16)(B)(iii), while the 2011 and 2012 versions of the Guidelines cited by the district court and the probation office number the provision § 2B1.1(b)(15)(B)(iii). Because there is no substantive difference, this opinion refers to § 2B1.1(b)(15)(B)(iii).

[4] Pursuant to U.S.S.G. §§ 2B1.1(b)(15)(C), (D), the cumulative adjustment from subsections 2B1.1(b)(2) and (b)(15)(B) cannot exceed eight levels. Brown does not challenge the six-level upward adjustment he received under § 2Bl.l(b)(2)(C) for having more than 250 victims; thus, the maximum possible upward adjustment under U.S.S.G. § 2Bl.l(b)(15)(B)(iii) was two levels, rather than the standard four. *See* U.S.S.G. § 2B1.1(b)(15)(C).

### C.  Eddings's sentencing.

#### 1.  Grouping counts 1–4 and 7–12 under U.S.S.G. § 3D1.2(d).

Eddings's PSR recommended that counts 1–4 (Ponzi scheme mail fraud), 7–10 (Ponzi scheme wire fraud and money laundering), and 11–12 (bankruptcy fraud) be grouped under U.S.S.G. § 3D1.2(d) because "the offense level is determined largely on the basis of the total amount of harm or loss." Eddings objected, arguing that the grouping was improper because the bankruptcy counts "involve different victims and modes of fraud and are unrelated to the investment scheme in manner and in time." The district court overruled Eddings's objection.

#### 2.  Increase under U.S.S.G. § 3B1.1(c) for leadership role.

The PSR recommended that Eddings's sentence not be increased under U.S.S.G. § 3B1.1 for a leadership role. The government objected, arguing that Eddings recruited others "who knowingly or unknowingly worked on the defendant's behalf to recruit victims." The district court found this a "close question," but determined that the government had proved that Eddings had acted as a leader and applied the adjustment.

### 3. Increase under U.S.S.G. § 2B1.1(b)(15)(B)(iii) for "endanger[ing] the solvency or financial security of 100 or more victims."

Over Eddings's objection, and with little discussion, the district court also applied a two-level increase under § 2B1.1(b)(15)(B)(iii) to Eddings's sentence. The court determined that, for "the same reasons . . . stated in Mr. Brown's sentencing," the increase was "applicable to Mr. Eddings as well."

### 4. Increase under U.S.S.G. § 2B1.1(b)(2)(C) for having 250 or more victims.

Eddings's PSR determined that he had 154 victims. The government objected, arguing that the total should include an additional 147 victims who invested with Brown prior to Eddings's involvement but to whom Eddings made lulling payments. The district court determined that the 147 victims "had at least some communication or contact with Mr. Eddings [and] therefore they should be added to his victim total as well." Consequently, Eddings's offense was increased by six levels under § 2B1.1(b)(2)(C).

### 5. Eddings's ultimate sentence.

Based on Eddings's offense level of 39, the Guidelines range was 262 to 327 months. U.S.S.G. Chapter 5 Part A. The district court was "concerned" about sentencing disparity because even a low-end sentence for Eddings would be over six years more than Brown's sentence. The court reviewed the "3553(a) factors" and noted that, without his reduction for acceptance of responsibility, Brown would have faced 210 to

262 months.  The court found that range also "appropriate" for Eddings's conduct, and gave a "downward variance," sentencing Eddings to a total term of 210 months.

### III.    Discussion

####    A. The denial of the government's motion to reduce Brown's sentence under U.S.S.G. § 5K1.1 was proper.

We review the district court's interpretation of the Guidelines de novo and its factual findings for clear error.[5] *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006).  In rejecting the government's § 5K1.1 motion, the district court properly exercised the "wide latitude" given by the Guidelines for "evaluating the significance and usefulness of the defendant's assistance. . . ."  *United States v. Awad*, 371 F.3d 583, 586 (9th Cir. 2004) (citation and internal quotation marks omitted).  The court gave the "substantial weight" required by the Guidelines to the government's evaluation of the defendant's assistance.  *See* U.S.S.G. § 5K1.1 cmt. 3.  But, the court also determined that any benefit to which Eddings was entitled under § 5K1.1 was offset by the aggravating nature of the § 3553(a) factors. Rather than granting the government's § 5K1.1 motion, but then upwardly departing because of the § 3553(a) factors, the district court simply denied the § 5K.1.1 motion.  This arrived

---

[5] There is a long-standing intra-circuit split on whether the district court's application of the Guidelines to the facts is reviewed de novo or for abuse of discretion.  *See, e.g.*, *United States v. Swank*, 676 F.3d 919, 921–22 (9th Cir. 2012); *United States v. Staten*, 466 F.3d 708, 713 n.3 (9th Cir. 2006) (discussing conflict dating to 1999).  Because the result in this case is the same under either standard of review, we need not resolve the conflict here.

at the same result and was not erroneous.  U.S.S.G. § 5K1.1 cmt. background;  *see also United States v. Tadio*, 663 F.3d 1042, 1046 (9th Cir. 2011) (permitting consideration of the § 3553(a) factors in the context of a post-sentencing motion for a reduction for substantial assistance).

### B. Brown's 188-month sentence is not substantively unreasonable under 18 U.S.C. § 3553(a).

As required by § 3553(a), the district court judge specifically considered Brown's offense and his personal characteristics in imposing the 188 month sentence.  The court noted that Brown "preyed upon particularly vulnerable victims," used victims' monies "for personal gains," "continued this scheme for a number of years, and impacted an incredible number of victims."  The victim impact statements chronicled "not just monetary impacts," but also that Brown "caused individuals to file for bankruptcy" and "caused a number of his victims to become homeless," and the court therefore concluded that the Guidelines did not "capture[]" the "full extent of the crime."  The district court fully explained its reasons for rejecting the sentence recommendations of the probation office and the government and gave a within-Guidelines sentence; this was not unreasonable.  *Rita v. United States*, 551 U.S. 338, 351 (2007) ("[W]hen the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable.").

### C.  Eddings's mail fraud convictions related to the bankruptcy fraud were based on a legally valid theory.

Counts 11 and 12 of the superseding indictment alleged that Eddings had

> knowingly devised and intended to devise a material scheme and artifice to defraud the Bankruptcy Court, the Bankruptcy Trustee, and various creditors of the Bankruptcy Case . . . [by filing] schedules and a statement of financial affairs, in which he falsely misrepresented and/or failed to disclose income, interests in assets, and bank accounts, and liabilities, in order to defraud the Bankruptcy Court, the Bankruptcy Trustee, and various creditors of money and property. . . .

Citing *Cleveland v. United States*, 531 U.S. 12 (2000), and *McNally v. United Sates*, 483 U.S. 350 (1987), Eddings argues that these charges impermissibly "allege a scheme to defraud the bankruptcy court and public fiduciary rather than individuals. . . ." Because Eddings did not raise this objection at trial, we review only for plain error. *United States v. Olano*, 507 U.S. 725, 731–32 (1993).

As an initial matter, the indictment does allege a scheme to defraud creditors; it also alleges that the Bankruptcy Court and Trustee were defrauded as well. But, even assuming Eddings was *charged* under an improperly overbroad theory, there was no plain error here because he was not *tried* under that theory. The superseding indictment was not introduced

at trial, and the judge described counts 11 and 12 to the jury as "mail fraud counts . . . that relate . . . to the defendant's bankruptcy." The government argued that Eddings had committed mail fraud by filing bankruptcy schedules that failed to disclose certain assets and artificially inflated his debts in order to enable him to obtain a "no asset discharge" without paying his creditors. The government never argued that the bankruptcy court or the trustee was defrauded. There was no plain error.

> ### D. The evidence was sufficient to sustain Eddings's convictions on the Ponzi scheme mail fraud charges.

In reviewing a claim of insufficient evidence, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted); *see also United States v. Hsiung*, 758 F.3d 1074, 1091 (9th Cir. 2014).

> #### 1. Count 1 – mail fraud based on lulling letter from Brown to Teresa R. dated August 30, 2006.

Brown drafted a lulling letter dated August 30, 2006 and postmarked September 5, 2006 to Teresa R. Eddings argues that, because Teresa R.'s interactions were with Brown, not him, there was no evidence from which to conclude that the letter was in furtherance of a joint fraud scheme.

But, because Eddings knowingly participated in the Ponzi scheme, he "is liable for his co-schemers' use of the mails or

wires." *United States v. Blitz*, 151 F.3d 1002, 1006 (9th Cir. 1998) (citation and internal quotation marks omitted). Brown's mailing was part of the scheme because it served "the purpose of lulling [the] victims." *United States v. Sampson*, 371 U.S. 75, 78, (1962).

Substantial evidence supports the conclusion that Eddings was participating in the Ponzi scheme when the letter was sent to Teresa R. Brown testified that, by that time, Eddings was aware of the lulling letters. Moreover, in November 2005, Eddings deposited new investor money to his WISE Investors account and immediately used those funds to pay Brown's old investors; he continued to deposit investor funds in that account through May 7, 2007.

> **2. Counts 3 and 4 – mail fraud based on lulling letters from Brown to Persia M. and Teresa B. dated May 18, 2007.**

A lulling letter from Brown dated May 18, 2007 was sent to Persia C. on May 22, 2007 and another to Teresa B. on May 23, 2007. Because the last investor deposit into Eddings's WISE Investors account was made on May 7, 2007, Eddings argues that there was no evidence to show that he was involved in the Ponzi scheme after that date. He therefore contends the evidence was insufficient for any rational juror to conclude that the May 22 and 23 lulling letters were in furtherance of a joint fraud scheme.

However, Persia C. and Teresa B. were both recruited by Eddings, not Brown. And, although the last deposit to Eddings's account was made on May 7, a transfer from that account to Brown's bank accounts was made on May 22, 2007, the date of the Persia C. letter. Moreover, Brown's

testimony established that Eddings was still involved in the scheme on May 22.

Even assuming that Eddings withdrew from the scheme on May 22, 2007, he is still liable "for uses of the mails or wires that are an inevitable consequence of actions taken while the defendant was a knowing participant in the scheme." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (citation omitted). Because Teresa B. was recruited by Eddings, the jury could reasonably conclude that Brown's lulling letter sent one day later was such a consequence.

### 3. Counts 11 and 12 – mail fraud based on notice of bankruptcy case and discharge.

Eddings's bankruptcy schedules falsely listed Brown as a creditor with a $2.5 million unsecured loan. The convictions on counts 11 and 12 were premised on mailings by the Bankruptcy Court of the Notice of Chapter 7 Bankruptcy Case and the Notice of Discharge. Eddings argues that these two mailings "were not incident to an essential part of the charged fraud scheme."

However, the bankruptcy fraud alleged in counts 11 and 12 did not arise from the Ponzi scheme but from Eddings's separate scheme "to defraud . . . various creditors of the Bankruptcy Case." The issue is thus whether the mailing of the bankruptcy notices was "incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 711 (1989) (citations omitted); *see also id.* at 713–15 (holding that a government entity's mailing of a routine document can create liability for mail fraud); *United*

*States v. Mitchell*, 744 F.2d 701, 703–04 (9th Cir. 1984) (same).

Trial testimony established that mailings to creditors are integral parts of any bankruptcy. An assistant bankruptcy trustee testified that the notice of filing is essential to the bankruptcy process and that a discharge is "the golden ring that people want in a bankruptcy. It's a declaration that all debts that are dischargeable are discharged and [the debtor] no longer personally owned any of the debt." There was sufficient evidence of the mailings' importance to Eddings's bankruptcy fraud scheme to support his convictions on counts 11 and 12.

### E. Eddings's bankruptcy fraud convictions were properly grouped for sentencing with his Ponzi scheme convictions.

The district court properly grouped Eddings's convictions on the bankruptcy fraud counts together with his Ponzi scheme convictions under U.S.S.G. § 3D1.2(d), which provides that offenses "covered by" certain Guidelines sections "*are to be grouped* under this subsection." U.S.S.G. § 3D1.2(d) (emphasis added.) All of Eddings's grouped convictions fall under § 2B1.1, one of the Guidelines sections specifically covered in § 3D1.2(d). Eddings was convicted of mail and wire fraud based on "various schemes" that "each involve[d] a monetary objective," precisely the sort of offenses that the application notes indicate should be grouped. U.S.S.G. § 3D1.2(d) cmt. 6, example 3.

Relying on *United States v. Defterios*, 343 F.3d 1020, 1023 (9th Cir. 2003), Eddings argues this grouping was improper because the bankruptcy fraud and Ponzi scheme

were "two separate crimes that were distinct in time, place, and victims." In *Defterios*, however, the two crimes were separately charged and tried. *Id.* at 1022–23. Here, the two crimes were charged and tried together. More importantly, Eddings's bankruptcy fraud arose, at least in part, from his efforts to conceal his participation in the Ponzi scheme by identifying the fruits of that crime as a fictitious "loan" from Brown; thus, the crimes were not separate.

### F. Applying a leadership role adjustment to Eddings's sentence under U.S.S.G. § 3B1.1(c) was erroneous.

The district court applied a two-level adjustment after finding that Eddings was "an organizer, leader, manager, or supervisor" in a criminal activity that was not "otherwise extensive." U.S.S.G. § 3B1.1(b), (c). The adjustment was based on Eddings's introduction to some victims as Brown's business partner and Eddings's recruitment of investors. The district court also noted that "there was some suggestion" at trial that "Mack [M.] was really under the direction of Mr. Eddings," but explicitly stated that Eddings's control over Mack M. "wasn't really made clear."

The application notes to U.S.S.G. § 3B1.1 provide:

> To qualify for an adjustment under this section, the *defendant must have been the organizer, leader, manager, or supervisor of one or more other participants*. An *upward departure* may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management

responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1 cmt. 2 (emphasis added). Eddings can only be subject to an adjustment as a leader under § 3B1.1(c) if he exercised "'some degree of control or organizational authority over *others*. . . .'" *United States v. Bonilla-Guizar*, 729 F.3d 1179, 1186 (9th Cir. 2013) (quoting *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir. 1990)). Here, the district court noted that it was not "really made clear" whether Eddings controlled Mack M., and the record does not indicate that Eddings controlled any other "criminally responsible participant[]" in the scheme. *United States v. Luca*, 183 F.3d 1018, 1024 (9th Cir. 1999). Nor did the district court impose an upward departure for Eddings's "management responsibility over the property, assets, or activities" of the Ponzi scheme. The two-level adjustment under § 3B1.1(c) was therefore improper.

**G. Increasing both defendants' sentences under U.S.S.G. § 2B1.1(b)(15)(B)(iii) for "endanger[ing] the solvency or financial security of 100 or more victims" was erroneous.**

U.S.S.G. § 2B1.1(b)(15)(B)(iii) requires an increase if "the offense . . . substantially endangered the solvency or financial security of 100 or more victims. . . ."

The district court found that the government had proved by a preponderance of the evidence that there were at least 100 victims whose solvency or financial security was endangered by the two defendants' actions. The total number of victims is not at issue; Brown conceded he had 405

victims, and Eddings conceded he had at least 154. The question on appeal is whether there is sufficient evidence that each defendant's actions substantially endangered the solvency or financial security of at least 100 of these victims.

There was some direct evidence on this topic presented at trial and at sentencing. Sixteen victims testified; none was wealthy.[6] Several victims testified that the defendants had convinced them to refinance their homes or to take out loans in order to have funds to invest. Both during trial and the sentencing proceedings testimony was presented that these 16 victims and their family members who invested with them were "affected dramatically" by investment losses: they lost homes to foreclosure, had cars repossessed, emptied retirement accounts, and liquidated investments and savings. There was thus sufficient evidence presented to demonstrate a significant endangerment of these witnesses' and their family members' financial security.

At sentencing, the government relied entirely on victim impact statements to close the gap between the victims addressed in direct testimony and the required 100. The prosecutor represented that "over a hundred statements were submitted." If the record actually contained 100 victim impact statements attesting to the impact of the crimes on the

---

[6] Their occupations included: a supervisor for the dementia care department of an assisted living facility, a station agent for the Bay Area Rapid Transit system, a caregiver, a self-employed caregiver for developmentally disabled clients, a correctional officer with the California Department of Corrections, a makeup artist, a retired county personnel services supervisor, a manager of a community health center, a professional figure skater, a school district employee, a project manager installing hardware and software for a dental company, a marketing director for a family entertainment center, and an in-home caregiver.

victims' finances—or even testimony about 100 such statements—there might well be sufficient evidence to support the adjustment . But, there are no victim impact statements in the record, and it is unclear how many were actually submitted. When questioned how many victim impact statements he had received, the probation officer replied: "Approximately a hundred. 79, still counting, still coming through," noting that they "mostly said the same thing."[7] The district court, however, was provided with only 29 victim impact statements; of those, 27 "indicated that [the victim] suffered either complete insolvency or complete financial disaster. . . ." The record does not reflect whether any of these impact statements came from the 16 witnesses who testified at the trial or the victims about whom they testified.

In the absence of specific evidence that 100 victims had their solvency or financial security endangered, the district court extrapolated from the impact statements before it in applying the adjustment :

> I think based on the information that probation has before it, and probation's representations to the Court, and probation's determination that this is applicable, I do find that the government has proven by a preponderance that there were at least 100

---

[7] Eddings conceded that 53 of his victims submitted victim impact statements. At the sentencing hearing, the judge stated, "I have a statement from a probation officer that says there are between 100 and 150 of these [victim impact] statements, all similar." There is nothing in the record specifically stating that there were "between 100 and 150 [victim impact] statements, all similar."

victims whose solvency was endangered. Based simply on the sampling, as well as what the Court has reviewed, almost 95 or 96 or 97 percent of those victims, just a small sampling, indicated that their solvency was endangered. So, I do think, under the facts of this case, that has been proven by a preponderance and [the adjustment] is applicable.

There are no published decisions or Guidelines commentary providing direction about how the government meets its burden of proof under § 2B1.1(b)(15)(B)(iii). But it is clear that the adjustment requires two findings: (1) that there were at least 100 victims, and (2) that the defendants' actions substantially endangered the solvency or financial security of at least that number of victims.

The government can rely on estimates to establish the total amount of loss suffered as a result of criminal activity, given the "difficulties inherent in calculating monetary loss." *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009). But here, the total amount of the loss is not in dispute. Rather, the issue is whether the government provided insufficient evidence to prove that at least 100 of the victims had their "solvency or financial security" substantially endangered as required by § 2B1.1(b)(15)(B)(iii). The language of the Guidelines requires linking the requisite endangerment to 100 specific victims.

We reject the government's argument that the district court could determine that 100 victims had their financial security substantially endangered solely by extrapolating from the 27 out of 29 victim impact statements provided to it.

There is nothing in the record to support the conclusion that this same ratio would hold across all victims. There is no evidence that the 27 were representative of the group of victims at large, nor any evidence from which the court could draw the conclusion that the impact of the losses the 27 suffered was representative of others.

Because the victim impact statements are not in the record, we cannot tell whether some were submitted by the trial and sentencing witnesses or their families. But, even if the 27 victims whose impact statements were reviewed by the district court are added to the trial and sentencing witnesses, this amounts to fewer than 50 victims for whom the government has provided proof of substantial endangerment.

The government failed to provide any other direct evidence that the remaining investors had their financial security threatened. The probation officer testified that he had reviewed 79 victim impact statements, each of which "mostly said the same thing." Even assuming that each of these victim impact statements came from other victims, the simple statement that they "mostly said the same thing" is not sufficient evidence that each of these 79 individuals had their solvency or financial security substantially endangered.

This is not to say that the crimes didn't significantly impact the financial security or solvency of other investors. A report from the probation department showed that over $7.5 million in investor money was deposited into Eddings's WISE Investors bank account while he and Brown together

operated the Ponzi scheme.**⁸**  Only one of those investors paid in less than $1,000.  Of the 154 investors who paid funds into the WISE Investors account, 105 paid in $10,000 or more, and 83 invested $15,000 or more.  The top 100 investors who paid in the most money put in between $15,000 and $550,000; their average investment was $79,233.98.

But the report does not attempt to determine whether any of those investors had their financial security or solvency "substantially endangered" by the scheme.  It seems quite likely that this was the case; the average sums invested are large and at least the investors who testified do not appear to have been wealthy.  But § 2B1.1(b)(15)(B)(iii) requires at least some showing by the government that the financial security or solvency of 100 individual victims was "substantially endangered" by the scheme. A $15,000 loss or even a $1,000 loss might well qualify, but we cannot conclude as a matter of law that this is the case for 100 victims.  The government provided sufficient evidence of the victims' losses, but it has not provided sufficient evidence of the *impact* of those losses on 100 victims.

This burden would not be difficult to discharge.  We do not suggest that the government must provide financial statements from individual victims or other detailed proof. The impact statements referred to by the district court apparently contained ample information that the Ponzi scheme had imposed the requisite damage on at least 27 victims.  A probation officer might well be able to provide the required information from a review of victim impact

---

**⁸** The PSR asserts that Brown was responsible for nearly $9 million in losses.  But the record contains no information about the individual investments made by Brown's victims prior to Eddings's involvement.

statements or from other materials. We hold only that the government, which almost surely could have done so, did not in this case provide evidence of the impact of the crimes on the requisite number of victims. We therefore find that the adjustments under § 2B1.1(b)(15)(B)(iii) were imposed in error.

Because there has not been "a full inquiry into the factual question at issue," we leave it to the district court to decide whether to take new evidence on this adjustment on remand. *United States v. Flores*, 725 F.3d 1028, 1043 (9th Cir. 2013).

### H. Increasing Eddings's sentence under U.S.S.G. § 2B1.1(b)(2)(C) for having 250 or more victims was erroneous.

U.S.S.G. § 2B1.1(b)(2)(C) provides: "If the offense . . . involved 250 or more victims, increase by 6 levels." Each of the victims "must have sustained a loss that is 'monetary or that otherwise is readily measurable in money' *and* that loss must be included in the loss calculation" made pursuant to U.S.S.G. § 2B1.1(b)(1). *United States v. Armstead*, 552 F.3d 769, 780–81 (9th Cir. 2008) (quoting U.S.S.G. § 2B1.1 cmt. 1.3(A)(iii)).

The district court found that the total loss attributable to Eddings under § 2B1.1(b)(1) was $7,129,448.20. Eddings conceded that the number of victims associated with this loss is approximately 154. The district court found that an additional 148 victims who had had "at least some communication or contact with Mr. Eddings" could be "added to his victim total as well." But, because these additional 148 victims were not included in the loss calculation under § 2B1.1(b)(1), they cannot increase his total

number of victims under § 2B1.1(b)(2)(c).  *Armstead*, 552 F.3d at 780–81.

The government concedes as much, but argues that the error was harmless because, under U.S.S.G. § 2B1.1(b)(15)(C), the "cumulative adjustments from application of both subsections [2B1.1](b)(2) and [2B1.1](b)(15)(B) shall not exceed 8 levels." Because Eddings received a two-level adjustment under § 2B1.1(b)(15)(B)(iii) and a six-level adjustment under § 2B1.1(b)(2)(C), meeting the eight-level cap, the government contends that any error under § 2B1.1(b)(15)(C) is immaterial.

However, we today have vacated the four-level adjustment to Eddings's sentence under § 2B1.1(b)(15)(B)(iii).  Thus, the cap set in § 2B1.1(b)(15)(C) has not been met, and the district court's erroneous calculation of Eddings's total number of victims under § 2B1.1(b)(2) is not harmless error.[9]

### I.  Remand will be to the same district court judge.

We reject the defendants' arguments that remand should be to a new judge because the district court judge's denial of the government's § 5K1.1 motion during Brown's sentencing indicates that he would be unable to "put aside his prior views" on that issue.  The district court dealt with that issue appropriately and there has been no other showing that this

---

[9] Because Eddings conceded he had more than fifty victims, his offense level remains subject to a four-level increase under U.S.S.G. § 2B1.1(b)(2)(B).

case meets the "unusual circumstances" required for remand to a different judge. *United States v. Paul*, 561 F.3d 970, 975 (9th Cir. 2009) (per curiam) (citation omitted).

## IV.    Conclusion

We affirm the district court's denial of the government's § 5K1.1 motion in Brown's sentencing and the court's application of the 18 U.S.C. § 3553(a) factors to him. We vacate the adjustment under U.S.S.G. § 2B1.1(b)(15)(B)(iii) to Brown's sentence for substantially endangering the solvency of 100 or more victims.

We affirm Eddings's convictions on all counts appealed. We affirm the grouping of counts 11 and 12 with counts 1–4 and 7–10 under U.S.S.G. § 3D1.2(d); vacate the application of a leadership role adjustment under § 3B1.1(c); vacate the adjustment under § 2B1.1(b)(15)(B)(iii) for substantially endangering the solvency of 100 or more victims; and vacate the determination under § 2B1.1(b)(2)(C) that Eddings had more than 250 victims.

This case is remanded to the district court for the resentencing of each defendant.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**