FILED
United States Court of Appeals
Tenth Circuit

June 20, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ROBERT LEE HOLLOWAY,

      Defendant - Appellant.

No. 14-4164

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:11-CR-00984-RJS-1)**

---

Gregory W. Stevens of Salt Lake City, Utah, for Defendant-Appellant.

Dave Backman, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the brief), District of Utah, Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **TYMKOVICH**, Chief Judge, **SEYMOUR** and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

A jury convicted Robert Lee Holloway of four counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). The district court sentenced Mr. Holloway to 225 months of imprisonment on all five counts. On appeal, Mr. Holloway contends he was denied his Sixth Amendment right to counsel of his choice and that the district court allowed impermissible victim impact testimony, denied him his constitutional right to confront witnesses, and improperly enhanced his sentence. We affirm.

## BACKGROUND

The charges against Mr. Holloway were the result of a scheme he created through his company, US Ventures, that defrauded over 250 investors and caused losses in excess of $15 million. Mr. Holloway began soliciting investors in 2005 by guaranteeing incredible returns in futures markets due to a mathematical algorithm he had created. When Mr. Holloway failed to realize the gains he promised, he started defrauding his investors by stating that his trading was profitable even though he lost substantial amounts of money, using money from new investors to pay other investors, and fabricating reports to investors stating that his daily returns were between 0 to 1.15% and that his trading never resulted in a loss. He also diverted investor funds for his own personal use.

At his initial appearance on December 16, 2011, the district court provided

Mr. Holloway with an attorney. Approximately twenty months later, Mr. Holloway's first attorney withdrew and another attorney was appointed to represent him. At a hearing on November 19, 2013, the magistrate judge told Mr. Holloway that it would be the last time his court-appointed attorney would be replaced and stressed to him that if he wished to retain his own attorney, he must do so by the end of 2013 to avoid interfering with the trial date. On June 23, 2014, the district court entered a trial order requiring that any motion to substitute counsel be filed at least 21 days before trial. On July 2, the court appointed an additional attorney as co-counsel for Mr. Holloway through trial.

Between March 2014 and July 2014, Mr. Holloway's appointed attorney attempted numerous times, without success, to show that Mr. Holloway was not competent to stand trial. Mr. Holloway appeared to be opposed to this trial strategy, stating on June 3 that "I certainly feel no lack of competency in going to court and telling the real story." Aplt. Br. at 11. On July 25, six days before trial, Mr. Holloway's court-appointed attorneys filed a motion to withdraw and to obtain a continuance, stating that Mr. Holloway had retained his own attorney. At a hearing to examine the motion, the district court recognized that "Mr. Holloway is entitled to counsel of his choice" and held that his new attorney, who attended the hearing, could appear and work alongside his current attorneys. Rec., vol. 4 at 194. But the court refused to reschedule the trial date and it denied the appointed attorneys' motion to withdraw and to continue the trial. After its

ruling, the court took a fifteen minute recess so Mr. Holloway and all three attorneys could decide how to proceed. After the recess, one of Mr. Holloway's appointed attorneys stated "[t]he decision has been made that [Mr. Holloway's retained attorney] will not be entering her appearance at this time," and that "[d]iscussion was had as to whether Mr. Holloway might wish to make a record on his own behalf and he has declined to do so." *Id*. at 200.

At trial, the government presented seven witnesses to show that Mr. Holloway had made false representations to investors. Over the objection of Mr. Holloway, four of those witnesses were allowed to testify to the impact Mr. Holloway's fraudulent scheme had on their lives. Their testimony is outlined *infra* in our discussion of this issue. The government also introduced thousands of pages of trading records and reports to investors that were designed to show Mr. Holloway's specific intent to defraud, the only element of wire fraud that Mr. Holloway denied. Mr. Holloway was convicted on all five counts, and the district court subsequently sentenced him to 225 months in prison.

Mr. Holloway filed a timely appeal, claiming: (1) the district court's denial of his motion to substitute counsel deprived him of his Sixth Amendment right to counsel of choice; (2) the district court's admission of the victim-impact statements was an abuse of discretion; (3) the district court violated the Confrontation Clause by not allowing him to fully cross-examine two witnesses; and (4) the district court erroneously included a six-level enhancement of his

-4-

sentence based on the claimed number of victims. We address each issue in turn.

DISCUSSION

A. *Sixth Amendment Right to Counsel of Choice*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have Assistance of Counsel for his defence." U.S. Const. amend VI. The Supreme Court has explained that "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). This right "stems from a defendant's right to decide what kind of defense he wishes to present." *United States v. Collins*, 920 F.2d 619, 625 (10th Cir. 1990) (citing *United States v. Nichols*, 841 F.2d 1485, 1502 (10th Cir. 1988)). We have recognized that "'[a]ttorneys are not fungible;' often 'the most important decision a defendant makes in shaping his defense is his selection of an attorney.'" *Id.* (quoting *United States v. Laura*, 607 F.2d 52, 56 (3d Cir. 1979)); *accord United States v. Jones*, 160 F.3d 641, 646 (10th Cir. 1998) ("[T]he selection of one attorney over another can profoundly affect the course and outcome of a trial.").

When a defendant is wrongly denied his right to counsel of choice, his deprivation is "complete" at the time of the denial "regardless of the quality of the representation he received." *Gonzalez-Lopez*, 548 U.S. at 148; *see also*

-5-

*United States v. McKeighan*, 685 F.3d 956, 966 (10th Cir. 2012).  Because

"erroneous deprivation of the right to counsel of choice [has] 'consequences that

are necessarily unquantifiable and indeterminate, [the deprivation] unquestionably

qualifies as structural error.'"  *Gonzalez-Lopez*, 548 U.S. at 150 (quoting *Sullivan*

*v. Louisiana*, 508 U.S. 275, 282 (1993)).  Accordingly, '[i]f a defendant is

wrongly denied his counsel of choice, no showing of prejudice is necessary to

establish constitutional error."  *McKeighan*, 685 F.3d at 966.

"Although there is a presumption in favor of a defendant's counsel of

choice, the right is not absolute."  *Id.* at 966.  The Supreme Court has long

recognized "a trial court's wide latitude in balancing the right to counsel of

choice against the needs of fairness and against the demands of its calendar."

*Gonzalez-Lopez*, 548 U.S. at 152 (internal citations omitted).  As we have

explained:

> A defendant's choice of counsel may be denied by a court's refusal
> to grant a continuance necessary to allow the chosen attorney to
> participate in the case.  This issue has arisen when a defendant had
> not obtained an attorney by the time of trial, *United States v. Kelm*,
> 827 F.2d 1319, 1320-21 (9th Cir. 1987); *United States v. Leavitt*, 608
> F.2d 1290, 1293-94 (9th Cir. 1979); when a chosen attorney claimed
> that he or she had inadequate time to prepare for trial, *Birt*, 725 F.2d
> at 591-92; *United States v. LaMonte*, 684 F.2d 672 (10th Cir. 1982);
> *Linton*, 656 F.2d at 208; . . . or when a defendant sought to obtain a
> new attorney immediately before, *Urquhart v. Lockhart*, 726 F.2d
> 1316, 1319 (8th Cir. 1984), or during trial *United States v. Lowe*, 569
> F.2d 1113, 1116 (10th Cir. [(1978]).

*Nichols*, 841 F.2d at 1504. Thus, "[o]nly when the trial court *unreasonably or arbitrarily interferes* with a defendant's right to counsel of choice do we agree a conviction cannot stand, 'irrespective of whether the defendant has been prejudiced.'" *United States v. Mendoza-Salgado*, 964 F.2d 993, 1016 (10th Cir. 1992) (quoting *Collins*, 920 F.2d at 625).

On appeal, Mr. Holloway states he "is not claiming that the District Court unreasonably or arbitrarily interfered with his right to counsel." Aplt. Br. at 37. In fact, he concedes the court's actions in denying his motion to withdraw and to continue trial were appropriate because "Mr. Holloway missed the deadline set by the Court for retaining counsel, his delay would have inconvenienced the government and its witnesses, and Mr. Holloway's then-existing counsel stated that they were willing and able to proceed." *Id*. at 37-38. Thus, as his own brief admits, the district court did not deprive Mr. Holloway of his Sixth Amendment right to counsel of choice.[1]

Instead, Mr. Holloway's argument is more properly characterized as a claim of ineffective assistance of counsel. He contends there was a total breakdown in

---

[1] The record fully supports the conclusion that the district court did not deny Mr. Holloway his right to counsel of choice. As we have explained, the court told Mr. Holloway that his retained counsel could appear and work alongside his court-appointed attorneys. After the court took a recess to allow Mr. Holloway a chance to consult with counsel and weigh the option, Mr. Holloway decided to continue with just his court-appointed counsel.

communication between him and his appointed counsel, as evidenced by the disagreement about trial strategy and his competency to stand trial, as well as the fact that his appointed attorneys were unaware he had secured a separate attorney. Mr. Holloway asserts that "[a] complete breakdown in communication between defendant and his or her counsel thus implicates the consideration whether counsel is *ineffective* under the Sixth Amendment." *Id*. at 38 (emphasis added). Every case that Mr. Holloway cites in support of his argument involved an ineffective assistance of counsel claim. *See*, *e.g.*, *Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir. 2000) ("In deciding whether a complete breakdown in communication rendered Appellant's representation *constitutionally ineffective*, we consider four factors." (emphasis added)); *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) ("[T]o compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever."); *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988) (complete breakdown in communication between attorney and client may give rise to presumption of ineffectiveness).  Mr. Holloway's argument is thus that he was denied effective assistance of counsel, not that he was denied counsel of choice.

While the current record does not support Mr. Holloway's complete breakdown claim,[2] we do not reach that issue because "[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal." *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc). The reason for this general rule is that "[a] factual record must be developed in and addressed by the district court in the first instance for effective review. Even if evidence is not necessary, at the very least counsel accused of deficient performance can explain their reasoning and actions, and the district court can render its opinion on the merits of the claim." *Id.* Accordingly, if Mr. Holloway wishes to establish there was a complete breakdown in communication between him and his appointed attorneys that rendered their representation ineffective, he must do so in collateral proceedings.

*B. Victim Impact Statements*

Relying on *United States v. Copple*, 24 F.3d 535 (3d Cir. 1994), Mr. Holloway contends the district court erred by allowing the government to present the testimony of several victims concerning the emotional impact the financial loss had on their personal lives. He maintains the error was not harmless because of the importance of the testimony "in establishing Mr. Holloway's guilt and the

---

[2] We note that after the district court sentenced Mr. Holloway, he thanked his court-appointed counsel, contrary to his claims on appeal regarding their relationship.

emphasis placed on that . . . testimony during closing [arguments] by the government." Aplt. Br. at 31. Although we question whether the district court should have allowed emotionally charged testimony, our review of the record persuades us any error was harmless in light of the overwhelming evidence of Mr. Holloway's specific intent to defraud investors.

At trial, a number of victims testified about the impact the fraud had on their lives.[3] David Story testified that he and approximately forty of his investors received only 3.1 million of the four million invested with US Ventures, that he had to sell everything to pay back the second-tier investors, that he lost relationships as a result, and that he ultimately filed for bankruptcy. Stanley Miller testified that he lost the $136,000 he invested in US Ventures while unemployed, and that he had cashed out his IRA and sold his house for the proceeds in order to invest. He further stated that "it separated our family" and that "we didn't end up with enough money to be able to afford to buy another

---

[3] After opening statements, Mr. Holloway moved to prohibit "the victim witnesses in this case from testifying to such matters as struggling to keep a roof over their head, losing everything, [and] having borrowed money to invest" as "not relevant to any of the elements of the charged offenses" because he believed it was "clearly designed to elicit the very sort of emotional impact that . . . should be avoided." Rec., vol. 4 at 538-39. He also argued the testimony was improper not only because it was not relevant under Fed. R. Evid. 401 but also because it was unfairly prejudicial under Fed. R. Evid. 403. The district court ruled that the government could ask the witnesses "open-ended questions" such as the amount the victim lost and how it impacted him or her but could not ask leading questions such as, "did you lose your shirt and everything you ever had?" or "[i]s it your life savings?" *Id.* at 541-42.

house, and I wasn't getting enough from Social Security to afford an apartment."

Rec., vol. 4 at 868-69. Mr. Miller broke down emotionally during this testimony.

In addition, Timothy Kohl testified he invested $94,000 in US Ventures through

Winsome Investment Trust, Robert Andres's investment company,[4] and that he

had taken out a second mortgage on his home. All of this had "caused a great

deal of marital distress." *Id.* at 834. Finally, Ralph Wayne Thompson testified:

> Those who know me still understand my integrity. But those who
> don't makes it a little more challenging to do future business that I
> had – I've always – I spend my life, it was important to me that my
> word meant something. Now to have that doubt there it's frustrating
> based on someone else's promises to me.

*Id.* at 361-62.

Mr. Holloway contends the government improperly emphasized the

personal impact the financial loss had on the victims' lives during closing

arguments. For example, the government stated Mr. Miller "sold his house to

invest more money in this fraud." Rec., vol. 4 at 1134. The government also

argued that "[t]he time has come for Mr. Holloway to be held responsible for

those lies and the enormous pain that he has caused families across this country

---

[4] Between 2005 and 2009, Robert Andres operated an investment company called the Winsom Investment Trust, which placed $24.7 million with US Ventures in what was later described as a ponzi scheme. *See Klein v. Widmark*, No. 211-cv-01097, 2015 WL 5038543, *1 (D. Utah Aug. 26, 2015). Because of his involvement in soliciting investors through Winsom for US Ventures, Mr. Andres pled guilty to wire fraud. *See United States v. Andres*, No. 2:11-cr-00985-RJS-PMW (D. Utah); *see also Klein*, 2015 WL 5038543 at *1.

through his lies." *Id.* at 1167. Mr. Holloway specifically claims the combined emotionally charged testimony of the four witnesses, the government's emphasis at closing on the emotional aspect of the testimony, "and the complete lack of a cautionary instruction on the issue leaves us at least with grave doubt that Mr. Holloway's guilt was established not by evidence relevant to the charges against him but by evidence that overtly and unnecessarily played to the sympathies of the jury." Aplt. Br. at 49.

Mr. Holloway rightly points out that in *Copple*, 24 F.3d at 545, the Third Circuit held the district court abused its discretion by allowing victim impact testimony in a mail fraud case[5] "beyond anything that was reasonable to prove Copple's specific intent to defraud." Copple was charged with numerous counts of mail fraud and tax evasion and found guilty on all counts. *Id.* at 540. His defense at trial "was that he had simply made a bad business decision when he, as trustee, had relied on the advice of experts to invest," and therefore had no specific intent to defraud. *Id.* at 545. The district court allowed the government to present the victims' testimony about their "losses, and about the impact of those losses on their lives." *Id.* at 544. Copple argued on appeal that the victims'

---

[5] "Because the requisite elements of the two statutes [mail fraud and wire fraud] are virtually identical, this court has held '[i]nterpretations of § 1341 are authoritative in interpreting parallel language in § 1343.'" *United States v. Fishman*, 645 F.3d 1175, 1186 n.7 (10th Cir. 2011) (alterations in original) (quoting *United States v. Weiss*, 630 F.3d 1263, 1271 n.5 (10th Cir. 2010)).

loss testimony was not relevant under Fed. R. Evid. 401 because proof of actual loss is not required to prove the elements of mail fraud. *Id.* He also argued "the testimony about the *impact* of the losses was both irrelevant . . . and unfairly prejudicial, and hence excludable under [Fed. R. Evid.] 401 and 403." *Id.*

While the court agreed in *Copple* that "[p]roof of actual loss by the intended victims is not necessary," *id.* (citing *United States v. Kelley*, 929 F.2d 582, 585 (10th Cir. 1991); *United States v. King*, 860 F.2d 54, 55 (2d Cir. 1988)), it explained that the evidence of loss was still relevant, *id.* at 545. It noted that "[p]roving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent." *Id.* But the court held that by allowing the loss testimony, the district court's "ruling encouraged the government to introduce a wide range of victim impact testimony in addition to the testimony about the size of the losses," and thus "[s]ome of the victim impact testimony went beyond anything that was reasonable to prove Copple's specific intent to defraud." *Id.* The court emphasized that "[t]estimony such as this had either no, or very little, probative value and was unfairly prejudicial." *Id.* at 546.

Notably, notwithstanding these conclusions, the court held "the error of admitting the victim impact statements was harmless because of the *overwhelming evidence of both the scheme to defraud and Copple's specific intent.*" *Id.* (emphasis added). There was evidence that Copple had falsified financial

-13-

statements, prepared wholly fictitious reports about investments, and used the victims' funds on extravagant personal expenses. *Id.* at 546-47. The court held the "evidence overwhelmingly indicates that Copple knowingly devised or participated in a scheme to defraud and did so with the specific intent to defraud," concluding "it was highly probable Copple would have been convicted for violating the mail fraud statute even if the victim impact testimony had been excluded." *Id.* at 547.

"A trial court's admission of inadmissible evidence will disturb a defendant's conviction only if the error is not harmless," *United States v. McVeigh*, 153 F.3d 1166, 1203 (10th Cir. 1998) (quoting *United States v. Cass*, 127 F.3d 1218, 1225 (10th Cir. 1997)), and the government bears the burden of establishing harmlessness, *id.* at 1204. "A non-constitutional error . . . is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Medina-Copete*, 757 F.3d 1092, 1108 (10th Cir. 2014) (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc)). "[C]autionary instructions are ordinarily sufficient to cure any alleged prejudice to the defendant." *McVeigh*, 153 F.3d at 1204.

Here, in order to prove wire fraud in violation of 18 U.S.C. § 1343,[6] the

---

[6] Section 1343 reads in relevant part:

(continued...)

government had to establish beyond a reasonable doubt the following four

elements, which were stated in jury instruction number twenty-nine:

> First, that there was a scheme or artifice to defraud or a scheme to obtain money or property by means of false pretenses, representations, or promises as alleged in the Indictment;
>
> Second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with *specific intent to defraud*;
>
> Third, that in execution or furtherance of that scheme, the defendant used or caused the use of interstate wires as specified in the Indictment; and
>
> Fourth, that the scheme employed false or fraudulent pretenses, representations, or promises that were material.

Rec., vol. 2 at 983 (emphasis added).

At trial, Mr. Holloway's defense specifically contested only the second

element, noting during opening statements "that despite the prosecution's

mountains of evidence, they won't be able to show beyond a reasonable doubt

that Mr. Holloway acted with that specific intent to defraud."  Rec., vol. 4 at 496.

Accordingly, the central issue with respect to the wire fraud charges was whether

---

[6](...continued)
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Mr. Holloway acted with the specific intent to defraud investors.

As we have repeatedly recognized, "fraudulent intent is difficult to prove with direct evidence," and thus "it may be inferred from circumstantial evidence considered in its totality." *United States v. Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015). One means of establishing intent to defraud is by proof of economic harm to victims of the fraud. *See United States v. Welch*, 327 F.3d 1081, 1104-05 (10th Cir. 2003) (citing cases); *Copple*, 24 F.3d at 544-45.

The government offered the testimony of several individuals concerning their financial losses, as well as the impact those losses had on their lives, in order to prove Mr. Holloway's specific intent to defraud investors. But the government introduced a considerable amount of other evidence as well. Included were excerpts from a deposition Mr. Holloway gave in the civil enforcement action brought against him by the Commodities Futures Trading Commission, in which he admitted that he sent investors false reports concerning asset statements and that he consistently lied to investors about their returns. In fact, on five of his worst trading days when he lost millions of dollars, Mr. Holloway actually reported gains to investors. He also sent particularly incriminating emails, admitting in one:

> I have lied to David ever [sic] single day and also Bob telling them that we have all the money. I lost another 25k today. . . . I do not think that you or Lou have any idea how serious this is[.] We are doing a ponzi deal by taking new clients [sic] money and "paying out salaries and distributions[.]" I am very close to shutting down and

-16-

coming clean with them[.]

Rec., vol. 6, Ex. 106. In another email Mr. Holloway admitted the following to his brother-in-law:

> First of all I lied to you, and did not disclose to you how bad things were [and how things were] getting worse. . . . [I] lied right to your face more than once about how things were when they were melting down. . . . My actions and lack of being forthright has [sic] caused you all this . . . but I am afraid that forgiveness for my dishonesty, and for the pain that all this caused is most likely out of the question. . . .

*Id.* at Ex. 117 at 1-2.

Previous employees also testified regarding Mr. Holloway's specific intent to defraud investors. For example, Jeff Torroll testified that Mr. Holloway wanted to know how to tell investors that US Ventures was generating a one percent daily return without getting the attention of an auditor. Mr. Torroll responded that "[w]e can't legally fudge the numbers, [sic] if statements are going to be audited outside of us, we'll get sued and maybe worse." Rec., vol. 4 at 424; vol. 6 Ex. 125. Another employee, Arnel Cruz, testified that Mr. Holloway did not disclose many of the losses to investors.

Our review of the record here convinces us that the emotionally charged victim impact testimony and the emphasis of some of this testimony during closing arguments did not have a "'substantial influence' on the outcome or leave[] one in 'grave doubt' as to whether it had such effect." *Rivera*, 900 F.2d at 1469 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also*

-17-

*McVeigh*, 153 F.3d at 1204 (holding emotional impact testimony harmless because it "could not have affected the outcome of the trial") (citing *Copple*, 24 F.3d at 546). In addition to the evidence of Mr. Holloway's specific intent to commit fraud, the district court gave a cautionary instruction telling the jury that '[t]he law does not permit jurors to be governed by sympathy, prejudice, or public opinion." Rec., vol. 2 at 954. *See McVeigh*, 153 F.3d at 1204 ('[T]he district court delivered strong cautionary instructions to the jury, which we presume the jury followed."). Mr. Holloway's counsel emphasized this instruction to the jury in his closing argument.

In sum, we are confident Mr. Holloway would have been found guilty of wire fraud even without the emotional victim impact testimony given the overwhelming amount of evidence of his specific intent to defraud investors.[7] Accordingly, even assuming it was error to admit this testimony, the error was harmless.

*C. Default Judgments*

Mr. Holloway next contends the district court erred when it excluded

---

[7] Given our conclusion that any error was harmless, we need not address Mr. Holloway's contention that the emotionally charged testimony was irrelevant and unfairly prejudicial under Rules 401 and 403 of the Federal Rules of Evidence. *See United States v. Magleby*, 241 F.3d 1306, 1318 (10th Cir. 2001) ("Notwithstanding our doubts regarding the relevancy of this testimony, we need not decide whether the district court abused its discretion in admitting it because we find that it was harmless error.").

evidence of default judgments entered against two of the government's main witnesses, Robert Andres and Robert Hall. The first default judgment involved Mr. Andres, the man who operated the Winsome Investment Trust and recruited more than 240 investors to invest in US Ventures through Winsome. Mr. Holloway and Mr. Andres were defendants in a civil action filed by the Commodities Futures Trading Commission against them and their companies, US Ventures and Winsome Investment Trust, for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2012). After no party answered the complaint, the court entered default judgments. The court accepted allegations in the complaint as true and made several factual findings against Mr. Andres and Mr. Holloway, including that Mr. Andres fraudulently solicited investors for Mr. Holloway's trading scheme, misappropriated investors' funds, falsely concealed their misappropriations and trading losses, made Ponzi scheme payments to other investors, and improperly invested in unrelated and undisclosed businesses.

The second default judgment involved an SEC enforcement action against Mr. Holloway and Robert Hall, a man who operated several entities that recruited investors to invest in US Ventures. After Mr. Hall failed to respond to the SEC's complaint, the court entered default judgment against him based on factual findings that he failed to tell investors a majority of their funds would be placed in high-risk futures trading; failed to disclose to investors the significant losses US Ventures and other investments had sustained or that payments made to them

-19-

were not interest payments but were funds from new investors; and that Mr. Hall

knew, or was reckless in not knowing, that US Ventures lost over $9 million in

investor funds during 2006.

Before Mr. Holloway's trial, the government filed multiple motions in

limine, two of which were motions to exclude evidence of both default judgments

and another to exclude evidence of the criminal information subsequently filed

against Mr. Hall for his alleged involvement in Mr. Holloway's fraudulent

scheme. Due to an agreement among the parties at the motions hearing, the

district court denied the government's motion seeking to exclude Mr. Hall's

criminal information. But the court granted both motions to exclude evidence of

the default judgments because it was of the view that the probative value of the

default judgment finding was low and was outweighed by the risk of prejudice

under Fed. R. Evid. 403. With respect to potential of prejudice, the court

explained:

> I'm quite concerned about whether we confuse the jury if we start
> bringing folks in here and start talking about judgments against them,
> which I think will require us to get into a discussion about what are
> the judgments, where did they come from, on what basis, what were
> the merits of those claims or allegations, what resulted in the
> judgment and the like.

Rec., vol. 4 at 235.

At trial, the district court allowed both the government and Mr. Holloway

to question Mr. Hall and Mr. Andres about the facts underlying the default

judgments to the extent they went to the credibility of the witnesses. The court also permitted Mr. Holloway to impeach Mr. Hall with the fact that the criminal charges brought against him were dropped before Mr. Holloway's trial at which Mr. Hall had agreed to testify for the government, and that those charges could be refiled at any time. The court also allowed Mr. Holloway to cross-examine Mr. Andres concerning the plea and cooperation agreements he had signed with the government when he pled guilty to wire fraud arising out of his involvement with Mr. Holloway and US Ventures.

Mr. Holloway now claims the district court violated his constitutional right to compulsory process and to confront adverse witnesses by not allowing him to cross-examine Mr. Hall and Mr. Andres regarding the findings entered against them in the default judgments. Specifically, he contends the exclusion prevented him from showing the full extent of Mr. Hall and Mr. Andres' involvement in the fraudulent scheme, and also prevented him from exploring the biases and undermining the credibility of the two men. Our review of the record persuades us otherwise.

As a preliminary matter, we note that because Mr. Holloway does not argue he was prevented from introducing witnesses or evidence in his favor, the Compulsory Process Clause is not at issue.[8] Rather, Mr. Holloway claims he was

---

[8] The Compulsory Process Clause states that "[i]n all criminal prosecutions,
(continued...)

not allowed to fully cross-examine Mr. Hall and Mr. Andres, in violation of the Confrontation Clause of the Sixth Amendment. *See*, *e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). Because Mr. Holloway asserts the district court violated a constitutional right with its evidentiary ruling, we review its decision de novo. *See United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004); *see also United States v. Gault*, 141 F.3d 1399, 1403 (10th Cir. 1998) (reviewing de novo whether a defendant's Sixth Amendment confrontation rights were violated by cross-examination restrictions).

The Sixth Amendment to the United States Constitution states that "[i]n all criminal proceedings, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "Confrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). "The main and essential purpose of confrontation *is to secure for the opponent the opportunity of cross-examination.*" *Id*. at 315-316 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). The Supreme Court has

---

[8](...continued)
the accused shall enjoy the right to . . . have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI. This right can properly be viewed as a right to present evidence rather than the right to challenge it. *See Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) (referring to the Compulsory Process Clause and stating "the state may not arbitrarily deny a defendant the ability to *present* testimony that is 'relevant and material, and . . . vital to the defense.'" (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)) (emphasis added)).

specifically "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Van Arsdall*, 475 U.S. at 678-79 (quoting *Davis*, 415 U.S. at 316-17). But it has also held that the Confrontation Clause does not prevent a "trial judge from imposing . . . limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Id*. at 679. District courts retain wide latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id*. Accordingly, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Unlike many constitutional violations, a defendant does not have to show prejudice with respect to the trial as a whole to state a violation of the Confrontation Clause. *Van Arsdall*, 475 U.S. at 680. Instead, "the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." *Id*. In evaluating whether a defendant's confrontation right has been violated, therefore, our task on review "is to determine 'whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias.'" *United States*

*v. Oliver*, 278 F.3d 1035, 1041 (10th Cir. 2001) (quoting *Gault*, 141 F.3d at 1403).

In *Oliver*, we faced a situation like the one in this case. Mr. Oliver was charged with bank robbery after the police arrested one of his accomplices and offered him a downward departure at sentencing if he agreed to testify against Mr. Oliver. *Id.* at 1038. At trial, Mr. Oliver attacked this witness's truthfulness by eliciting facts regarding his failures to appear in court after specifically agreeing to do so, and by questioning him about his plea bargain and his motives for entering into it. *Id.* at 1041. While the district court allowed exploration of these general areas, it did not permit Mr. Oliver to "inquire about the specific nature of charges pending against [the witness], the specific amounts of jail time [the witness] might serve, or the specific nature of the underlying charges in his failures to appear." *Id.*

We held in *Oliver* that the district court "imposed only reasonable limits on cross-examination and afforded Oliver ample opportunity to portray [the witness] as biased and motivated to lie." *Id.* Just as the limitations imposed in *Oliver* "did not significantly impede Oliver's ability to challenge the 'believability of [the] witness and the truth of his testimony[,]'" *id.* (*quoting Davis v. Alaska*, 415 U.S. at 316), neither did the limitations imposed on Mr. Holloway significantly impede his ability to challenge the believability and truthfulness of Mr. Hall and Mr. Andres.

-24-

As to Mr. Hall, the jury heard that his companies were in a symbiotic relationship with US Ventures whereby they would collect money from investors, promise those investors a certain return based on the returns his companies were realizing from US Ventures, and then keep any gains above the rate of the promissory note. This allowed the jury to see the level of Mr. Hall's involvement in Mr. Holloway's fraudulent scheme, a level of involvement that Mr. Holloway claims was absent due to the exclusion of Mr. Hall's default judgment. Moreover, the district court did not restrict Mr. Holloway from questioning Mr. Hall regarding the criminal information filed against him. Mr. Holloway was allowed to, and did, question Mr. Hall about the nature of the criminal charges brought against him, the circumstances in which those charges were dropped, and how they could be refiled at any time. Mr. Holloway further developed Mr. Hall's potential bias by obtaining an admission from him that the government had asked him to testify against Mr. Holloway in connection with dropping the criminal charges, ultimately asking, "it would be in your interest to testify strongly against my client, Mr. Holloway, wouldn't it?" Rec., vol. 4 at 730.

As to Mr. Andres, the jury heard him admit he recruited investors based on false information and disseminated Winsome balance sheets that falsely represented its total assets. As with Mr. Hall, this line of questioning showed that Mr. Andres was not an innocent bystander in Mr. Holloway's fraudulent scheme. The jury also heard that Mr. Andres had pled guilty to wire fraud charges related

-25-

to the US Ventures scheme and that part of his plea agreement with the government involved a possible downward departure for testifying against Mr. Holloway, questioning that gave the jury good reason to question Mr. Andres' credibility.

Ultimately, the district court permitted Mr. Holloway to establish, through other lines of questioning, everything he wanted to establish with the default judgments–the witnesses' bias, lack of credibility, and active roles in the fraudulent scheme. As the district court explained in the motions hearing, the reason for restricting the evidence of the default judgments was potential confusion of the jury. The Confrontation Clause does not require the admission of confusing and redundant testimony when a defendant has other avenues to attack a witness's credibility. Consistent with that principle, the district court in this case imposed only reasonable limits on cross-examination and afforded Mr. Holloway ample opportunity to portray Mr. Hall and Mr. Andres as biased and non-credible. Accordingly, the Confrontation Clause was not violated.

*D. Sentencing Enhancement*

Mr. Holloway's final claim is that we should remand his case for resentencing because the district court erred in calculating the applicable Guideline range. The court calculated Mr. Holloway's Guideline range as 188 to 235 months and sentenced him to a term of imprisonment of 225 months. Part of that calculation came from a six-level enhancement that applies if a crime

"involved 250 or more victims." U.S.S.G. § 2B1.1(b)(2)(C) (2014). A victim was defined as "any person who sustained any part of the actual loss," § 2B1.1 n.1, and "actual loss" was defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. at n.3.[9]

A district court must make independent findings to support its loss calculation and should attempt to connect the number of victims to the loss calculation. *United States v. Foley*, 508 F.3d 627, 633 (10th Cir. 2007). Mr. Holloway contends there was no evidence presented at any time showing that each of the 250-plus investors suffered an "actual loss." Aplt. Br. at 58. In fact, Mr. Holloway asserts, the only evidence the government offered of investors suffering actual losses was from the seven witnesses it called at trial. Because there would have been no enhancement if the number of victims was fewer than ten, *see* § 2B1.(b)(2)(A), Mr. Holloway concludes that his Guideline range should have been 135 to 168 months.

After examining the transcripts from the sentencing hearing, however, it is clear that Mr. Holloway failed to make an objection regarding the total number of victims. When the district court asked both parties if they had any objections, Mr. Holloway replied, "I reviewed the presentence report yesterday and again

_____

[9] This particular guideline was completely revised in 2015, redefining the relevant number of victims as well as the type of loss required. *See* U.S.S.G. § 2B1.1(b)(2) and n.4(F) (defining "substantial financial loss").

today and there's nothing major. Well, I guess I would say one thing is there is a question in my mind anyway about how many victims did Mr. Holloway really consciously know about."[10] Rec., vol. 4 at 135. The court replied, "[i]nsofar as that's an objection to the calculation to the guidelines as it now exists in view of the modifications we've made today, I'm overruling that objection." *Id.* at 136. Thus, while Mr. Holloway did contend there was insufficient evidence showing that he *was aware* there were 250 "victims," he failed to object, as he does on appeal, to the number of "victims" being over 250. These two objections are substantially different. The former assumes there are over 250 "victims" (i.e., those suffering an actual loss) but that Mr. Holloway was not aware of them; the latter deals with whether the investors were "victims" at all. Mr. Holloway's objection was thus not sufficiently specific to provide the district court an opportunity to correct its action in the first instance. *See United States v. Robertson*, 568 F.3d 1203, 1209 (10th Cir. 2009) ("Fairness and judicial efficiency demand that litigants notify the district court of a procedural sentencing error with reasonable specificity, thereby providing that court the opportunity to correct its action in the first instance.").

"We have repeatedly held that if a defendant fails to object to his

---

[10] Mr. Holloway admits on appeal, and rightly so, that "[t]he Guidelines do not require that defendants intended to cause particular victims' losses or even have knowledge of those victims when calculating the defendant's offense level." Aplt. Br. at 56-57

presentence report, he waives his right to challenge the district court's reliance on it, unless the district court's decision to do so amounts to plain error." *United States v. Ivy*, 83 F.3d 1266, 1297 (10th Cir. 1996) (citing *United States v. Saucedo*, 950 F.2d 1508, 1518 (10th Cir. 1991), *overruled on other grounds by Stinson v. United States*, 508 U.S. 36 (1993)). "A factual dispute concerning the applicability of a particular guideline, not brought to the attention of the district court, does not rise to the level of plain error." *Saucedo*, 950 F.2d at 518 (citing *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991) ("Questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error."); *see also United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998); *United States v. Yarnell*, 129 F.3d 1127, 1137-38 (10th Cir. 1997). The PSR stated that the US Ventures scheme defrauded over 250 victims for a loss of over $15,000,000. Mr. Holloway did not object to this factual assertion in the district court. Accordingly, if the district court erred in adopting this assertion in the PSR, any error was not plain.

We **AFFIRM**.