**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 19, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROBERT LEE HOLLOWAY,

    Defendant - Appellant.

No. 18-4083

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. Nos. 2:17-CV-00267-RJS & 2:11-CR-00984-RJS-1)**
_____

Gregory W. Stevens, Salt Lake City, UT, for the Appellant.

Ryan D. Tenney (John W. Huber, United States Attorney, with him on the brief), Office of the United States Attorney, District of Utah, Salt Lake City, UT, for the Appellee.

_____

Before **HARTZ**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

A jury convicted Robert Holloway in federal district court of four counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of submitting a false tax return in violation of 26 U.S.C. § 7206. The district court sentenced Holloway to 225 months' imprisonment, after applying a six-level enhancement for crimes involving 250 or more

victims under U.S.S.G. § 2B1.1(b)(2)(C) (2014).[1]  After unsuccessfully challenging his conviction and sentence on direct appeal, Holloway filed a 28 U.S.C. § 2255 motion raising three grounds for relief: (1) that a total breakdown of communication between Holloway and his trial counsel caused his trial counsel to perform ineffectively; (2) that his trial counsel acted ineffectively by failing to argue that the evidence did not support the district court's application of the six-level sentencing enhancement; and (3) that the prosecution violated his due process rights by failing to turn over to the defense favorable information possessed by a prosecution witness contrary to Brady v. Maryland, 373 U.S. 83 (1963).  The district court denied Holloway's § 2255 motion, but granted a certificate of appealability on all three issues.  We exercise jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253 and affirm.

## I.

Robert Holloway was the president and CEO of US Ventures—a company that traded in the futures market.  Holloway told investors he had developed a special algorithm that allowed him to trade without losses.  He claimed that because of the algorithm he "could trade the markets and make money whether the market went up or the market went down."

Holloway's grandiose claims were false.  Instead, for several years Holloway operated US Ventures as a "Ponzi deal"—"taking new clients' money and paying out

---

[1] All references U.S.S.G. § 2B1.1 in this opinion are to the 2014 version.

salaries and distributions." This scheme continued until 2007 when the SEC froze his accounts.

Holloway subsequently faced criminal charges. Relevant to this case, federal prosecutors indicted Holloway on four counts of wire fraud and one count of submitting a false tax return.

Attorney Edwin Wall initially represented Holloway in his criminal case. Approximately a month and a half before trial was set to begin, Wall withdrew as counsel for Holloway. After Wall's withdrawal, the district court vacated the trial date due to the complexity of the case and appointed attorney Kevin Murphy to represent Holloway.

On November 19, 2013, the district court held a status conference hearing with the parties. Murphy mentioned a long-shot chance that Holloway might retain private counsel before trial. The judge responded directly to Holloway: "[I]f you're going to retain counsel you're going to do so by the end of the year. We're not going to delay this trial date. And so if you hire a lawyer, you are welcome to do so, but it has got to be by the end of the calendar year so he can get in and get up to speed and maintain all of the dates that we have got."

In March 2014, Murphy filed a motion requesting a hearing on Holloway's competency. In support of the motion, Murphy attached a competency evaluation and a supplemental evaluator memorandum written by Dr. Jonathan Bone. During his initial competency evaluation, Dr. Bone determined that Holloway exhibited mild paranoia, and features of mania and hypomania. He also noted that Holloway met the criteria for

3

Narcissistic Personality Disorder. Yet, he ultimately concluded that Holloway was competent to stand trial.

In his supplemental evaluation, however, Dr. Bone expressed greater concern regarding Holloway's disposition and ability to stand trial. Dr. Bone stated that he "believe[d] that [Holloway was] likely compromised with regard to judgment, decision-making, and assisting properly in his defense."

For his part, Holloway adamantly opposed an incompetency defense, and his counsel's supposed fixation on his mental health frustrated him. Emails between Holloway and Murphy demonstrate the increasing strain these competency evaluations placed on the attorney-client relationship. For example, Murphy repeatedly sought Holloway's permission to disclose Dr. Bone's evaluation to prosecutors. Holloway denied each request.[2] In an email dated March 24, 2014, Murphy requested that Holloway allow him to talk with prosecutors generally about Dr. Bone's evaluation without disclosing it to them. Holloway responded:

> My answer would be. Since i strongly disagree with the report, especially the assertion of you and Dr. Bone what it was faked My answer is a definate no. I do not want anything regarding this report discussed in anyway shape or form with prosecutors or anyone else. As far as a more definite pea bargain i am not interested in showing our ( your) hand at this time. At such time as it would be appropriate i will let you know.[3]

---

[2] Ultimately, Murphy sought *ex parte* authorization from the magistrate judge to file certain material related to Holloway's mental health under seal.

[3] The email excerpts reproduced in this opinion are in their original form. We have not edited their contents.

Holloway expressed a similar sentiment in an email dated March 27, 2014, after Murphy again asked for permission to disclose Holloway's mental health evaluation to prosecutors:

> You told me that Bone was brought in to evaluate whether or not there was an attempt to defraud. I was also told by you that the investigator was brought in by you on limited resources to investigate potential lead that would bring out the truth. Instead it appears Dr. Bone & the investigators were brought on solely to portray me as mentally ill. If I had of known Dr. Bones background regarding his work with as an expert on the criminally insane or innocence by being mentally ill pleas, and that was your intent from the beginning, I would have gone in completely different direction.

> Spending the limited resources that the Government allocated to you to attempt to convince me into a plea deal was not part of the intended plan. We have now wasted 7 months of my life to be nowhere. Being creative, not being like everyone else in a box does not equate mental illness. I do not appreciate the constant reference to your belief that I am mentally ill or your belief that I faked the results of the test merely because the results did not support your theory of the case.

> Your job is to defend me not package me for the purpose of an easy plea. In my last meeting with you & Dr. Bone I felt like I was ambushed. The accusations and language used by both of you which is still continuing is what I would expect from an accuser not from my counsel. The last 7 months should have been spent addressing the facts of the case rather than looking for the simple way out. Early on it is apparent you bought into the Government side of the case rather than attacking it or addressing my side.

> With what little time we have we need to spend it building my case. To show Government that report is of no benefit to my case. Rather showing that each of the Government witnesses have a reason to lie, that I did not intently mislead any investor and that the Governments attempt to make me look like the ringmaster is not true.

On March 31, 2014, Murphy asked Holloway if he would agree to a second psychological evaluation. Holloway wrote back:

> It has been my written and verbal direction since retaining you to seek out the truth that would prove same and get closure for me and my family.

5

Instead it seems evident that your intent is to take the easy road, try to prove me insane, dump me and go on with your law practice. After multiple emails and verbal instructions to cease the insults, and personal attacks yet you continue. I will ask you one more time to stop the attacks. It is apparent that you have no interest in defending me . . . spending 7 months doing nothing to same. If you want out . . . get me a large delay and i will figure it out myself. Its apparent the person who is afraid of the Prosecutor is you not me.

Answer is again no . . . Had i known you were going to this focused on trying to ambush and almost extort me into saying uncle i would have never agreed. Had i known the background of Bone whos deal is criminal insane plea . . . same

The same day, Murphy filed the motion seeking a hearing on the competency issue.

On April 4, 2014, a federal magistrate judge held a status hearing. After reviewing Murphy's motion on competency and hearing from both parties, the judge issued an Order for Competency Evaluation.

Scheduling the court-ordered competency evaluation caused even more friction between Holloway and Murphy. Holloway was adamant that the evaluation not be scheduled over a weekend and that he be given several weeks' notice so that he could take the best flights. He also pointed out to Murphy that the prosecutors scheduled the evaluation over Easter weekend, and asked Murphy to request different dates. Murphy followed up with prosecutors on Holloway's request and later informed Holloway that they "refuse to re-schedule the competency examination dates, even though I reminded them it is Easter weekend. They are making arrangements to pay your air fare to come here for the examination."

Dr. Noel Gardner evaluated Holloway on April 19, 2014. He determined that Holloway has "situational[ly] paranoid interpersonal perspectives" and has a "narcissistic

6

personality makeup." He also concluded that Holloway has a "very mild form of persistent hypomania." But despite these conditions, Dr. Garner concluded that Holloway "has the capacity but not the willingness to carefully assess [his] legal options" and that Holloway did not have a "mental disease or defect" that would render him incompetent "to stand trial."

On June 3, 2014, the district court held another status conference hearing.[4] The district court invited Holloway to address the issue of his competency. Holloway stated:

> Well, Your Honor, I trust the direction that—that my counsel is taking. I certainly feel no lack of competency in going to court and telling the real story, and have no lack of confidence that when we get there we're going to be able to prove innocence. So I'm not—I'm not—I certainly don't want to be—you know, I'm ready to go. I mean I have—I have no desire to (unintelligible) negate my right to be able to have a fair trial. So I'm sure we don't want to go down that road.

At the hearing, Holloway also told the district court that he had not seen a copy of Dr. Bone's evaluation, although he asked for a copy, and that he learned of the results from Dr. Garner's evaluation during the hearing. The district court eventually found that Holloway was competent to stand trial.

The day after the hearing, Holloway expressed his anger regarding Murphy's focus on competency. Holloway emailed Murphy that:

> The competency fiasco is not behind us . . . It was your tact not mine. As far as i am concerned and it is agreed by a great deal of people is we have wasted 1 year of valuable time based on the understanding that you do not understand what the make up of a complex man is. You from day one convicted me and really do believe what the prosecutors have. You have

---

[4] Holloway claims that by this time his relationship with Murphy had deteriorated so much that he and Murphy were no longer communicating by telephone.

emphatically stressed that you think i am guilty and mentally ill and argued with the judge that Gardner was wrong . . . . . so it is not behind us.

. . .

I am not mad at you but its not behind us. You humiliated your client by going outside of my instructions and causing this entire delay.

Are we going to have a strategy or not? if so what is it.

I am calm yet focused. I am not going to sit back and trust your strategy because so far you are on the same side as the Gov trying to bail and have me plea.

Holloway also expressed his concern that Murphy should have spent more time formulating a defense, stating that "[w]e clearly should have been preparing for trial 9 months ago instead of this last minute deal. I am not happy with how this is going."

Ultimately, Holloway retained private counsel without informing Murphy. On July 23, 2014, six days before trial was set to start, the prosecutors in this case received a call from attorney Rebecca Skordas informing them that she had just received a retainer to represent Holloway. She also informed the prosecutors that Holloway had asked her to request a trial continuance. On July 25, 2014, prosecutors informed the district court of this development. That same day, Murphy filed a motion to withdraw as Holloway's counsel. The motion stated:

> Without passing judgment upon the propriety of defendant Holloway's request, it does behoove defense counsel, as a matter of courtesy, to present the request to this Court. Also, as this motion was being drafted, defense counsel received the prosecution's sixteen-page "Notice of Defendant's Potential Motion to Substitute Counsel and Move for at [sic] Trial Continuance."
>
> . . .

8

The prosecutors characterize Defendant's request as a "last-minute, desperate attempt to manipulate the legal system . . . ." That seems unnecessarily harsh. It will suffice to respond that defendant Holloway's judgment is suspect.

The district court held a hearing on the motion and the final pretrial conference on July 28, 2014. The district court was prepared to permit Skordas to enter an appearance as Holloway's counsel, but after a recess, Holloway agreed to proceed to trial with Murphy and Murphy's co-counsel. The district court denied Holloway's motion to continue the trial and denied Murphy's motion to withdraw. The case proceeded to trial as planned.

During the government's case-in-chief, it called witnesses who testified regarding the numbers of investors in US Ventures. Four main investor groups invested in US Ventures. Representatives of each group testified at trial that their groups lost money. Although each group received some money back from their investments, representatives of each group testified that collectively each group lost money during Holloway's scheme. Their testimony indicated that at least 363 individual investors invested in US Ventures.[5]

---

[5] Robert Andres, head of Winsome Investment Trust, testified that Winsome Investment Trust had "about 239, 240, 260" individual investors. Klein testified that the bank records showed that Winsome Trust investors gave Holloway $24.7 million, but they received only $14.5 million back.

David Story, majority owner of US Ventures International, testified that US Ventures International had "approximately a hundred individual investors." Klein testified that US Ventures International investors gave Holloway approximately $4.45 million, but they received only approximately $3.39 million back.

9

Roy Klein testified at trial. Klein was the "court appointed receiver" in the related civil matter recovering funds. The government explained that it called Klein "only as a summary witness of the bank records."

For his part, Klein testified that he worked on "a related civil matter" and had "familiarity with the bank records of U.S. Ventures." He explained that his staff had prepared spreadsheets summarizing 5,300 pages of bank records. He then detailed the amounts that investor groups had paid Holloway and the amounts they had received back.

Holloway had requested that Murphy defend him on a theory of intent, but at the end of trial the jury convicted Holloway on all counts. Holloway then appealed. See United States v. Holloway, 826 F.3d 1237 (10th Cir. 2016). He raised four issues, two of which are relevant here.

First, Holloway raised what we interpreted as an ineffective assistance of counsel claim based on "a total breakdown in communication between him and his appointed counsel." Holloway, 826 F.3d at 1242. We did not, however, reach that issue "because '[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal.'" Id. at 1243 (quoting United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995)).

---

Duane Johnson and Ralph Thompson of Novus Technologies testified. Approximately twenty-four Novus Technologies investors invested with Holloway. Novus Technologies investors invested approximately $872,000 and they received only approximately $266,000 back.

Casey Hall of RCH-2 did not testify about the number of investors involved. Roy Klein testified that the RCH-2 investors gave Holloway approximately $3.2 million, but they received only $168,461.90 back.

10

Second, Holloway claimed that the district court erred in calculating the applicable Guideline range—specifically, that "there was no evidence presented at any time showing that each of the 250-plus investors suffered an 'actual loss.'" Id. at 1250–51; see also U.S.S.G. § 2B1.1(b)(2)(C). But at sentencing Holloway "failed to object, as he [did] on appeal, to the number of 'victims' being over 250." Id. at 1251. Indeed, at sentencing he argued "there was insufficient evidence showing that he *was aware* there were 250 'victims' . . . ." Id. (emphasis in original). Because Holloway failed to object to the *number* of victims at sentencing, we reviewed his claim for plain error. We concluded that "any error was not plain." Id. at 1251–52.

After we affirmed Holloway's conviction and sentence, Holloway filed a 28 U.S.C. § 2255 motion. In his motion, he raised three grounds for relief. First, he reasserted his ineffective assistance of counsel claim based on a complete breakdown of communication between him and his trial counsel. Second, he claimed that the government failed to prove there were 250 or more victims and that by failing to object Murphy provided ineffective assistance. Finally, Holloway argued the prosecution violated his due process rights by not turning over to the defense favorable information in the custody of the receiver.

The district court denied Holloway's § 2255 motion, but granted Holloway a certificate of appealability on all three issues raised in his motion. We address each issue in turn.

II.

"We review the district court's legal rulings on a § 2255 motion de novo and its findings of fact for clear error." United States v. Orange, 447 F.3d 792, 796 (10th Cir. 2006).

We review mixed questions of law and fact de novo. This includes ineffective assistance of counsel claims and claims brought under Brady v. Maryland, 373 U.S. 83 (1963). Hickman v. Spears, 160 F.3d 1269, 1273 (10th Cir. 1998) (ineffective assistance of counsel claims); Banks v. Reynolds, 54 F.3d 1508, 1516 (10th Cir. 1995) (Brady claims).

III.

A.

Holloway contends a total breakdown in communication existed between him and his trial counsel and that breakdown caused a violation of his Sixth Amendment right to effective assistance of counsel.

Ineffective assistance of counsel claims ordinarily require a showing of both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). But in "certain circumstances a presumption of ineffectiveness arises making it unnecessary to examine [the] actual performance of counsel." United States v. Soto Hernandez, 849 F.2d 1325, 1328 (10th Cir. 1988) (citing United States v. Cronic, 466 U.S. 648, 658 (1984)). This rule may apply when there has been a "complete breakdown in communication between an attorney and client." Id.

While no precise definition exists of "[t]he types of communication breakdowns that constitute 'total breakdowns,'" generally "a defendant must put forth evidence of a

12

severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." United States v. Lott ("Lott I"), 310 F.3d 1231, 1249 (10th Cir. 2002). We consider four factors when determining whether a complete breakdown in communication rendered a defendant's representation constitutionally ineffective:

> 1) whether the defendant's motion for new counsel was timely; 2) whether the trial court adequately inquired into defendant's reasons for making the motion; 3) whether the defendant-attorney conflict was so great that it led to a total lack of communication precluding an adequate defense; and 4) whether the defendant substantially and unreasonably contributed to the communication breakdown.

Id. at 1250 (citing Romero v. Furlong, 215 F.3d 1107, 1113 (10th Cir. 2000)). Applying these four Romero factors, the district court concluded that no complete breakdown in communication rendered Holloway's representation ineffective. Holloway v. United States, No. 2:17-CV-267, 2018 WL 1831835, at *2–3 (D. Utah Apr. 16, 2018).

Holloway contends the district court erred when it analyzed each Romero factor. We now analyze each factor and conclude that no total breakdown in communication occurred.

First, we consider whether Holloway "made a timely motion requesting new counsel." Romero, 215 F.3d at 1113. Holloway contends his motion for new counsel was timely, even though he filed it six days before a long-scheduled multi-week trial because: (1) the district court did not find that he filed the motion *simply* for the purpose of delay; (2) he was unable to retain counsel of his choice until late in the process for financial reasons; and (3) although the deadline for filing a motion to

13

substitute counsel was set 21 days before trial, his counsel did not inform him of that deadline.

None of these arguments convince us that Holloway's motion was timely. First, while the district court did not find that Holloway filed the motion to delay trial, throughout the litigation the district court warned Holloway that if he wanted to hire private counsel he needed to do so quickly. ("We're not going to delay this trial date. And so if you hire a lawyer . . . it has got to be by the end of the calendar year so he can get in and get up to speed and maintain all of the dates that we have got."). More importantly, Holloway submitted an affidavit in support of his § 2255 motion that stated if he "had known of the 21-day deadline, [he] would have retained Ms. Skordas earlier, because my friend who paid her retainer for me had the funds available." Because by his own admission he *could* have hired counsel earlier, but nevertheless decided to wait until six days before trial, we are convinced the motion was untimely.

Next, we examine whether the trial court adequately inquired into the matter. Romero, 215 F.3d at 1113. Significantly, at the hearing on Murphy's motion to withdraw, the district court did not specifically inquire into the total breakdown of communication between Holloway and Murphy. Murphy's motion, however, never expressly raised the issue. Indeed, Murphy informed the district court that he requested to withdraw as counsel because Holloway had obtained private counsel (Skordas).

14

At the same hearing, the district court granted Murphy a recess after denying the motion to withdraw so that Murphy, Skordas, and Holloway could meet and discuss Skordas's role. When they returned, Murphy explained to the district court that Skordas would not make her appearance as Holloway's counsel at the time. Murphy then represented, in Holloway's presence and with no objection from Holloway, that they had discussed whether Holloway "might wish to make a record on his own behalf" in connection with the motion to "[c]ontinue the trial and substitute counsel," but that he had declined.[6]

Under these circumstances, where neither counsel nor the defendant indicated that a total breakdown of communication existed, *and both had an opportunity to do so*, we conclude the district court adequately inquired into the matter. See Romero, 215 F.3d at 1114 (concluding "we . . . doubt whether the trial court failed to make an adequate inquiry under the circumstances," where the appellant made an ambiguous statement that may have put the trial court on notice of his complete breakdown of communication claim and where the appellant failed to renew his objection after his counsel indicated that the trial court's resolution would adequately resolve any conflict).

---

[6] Holloway claims his conflict with Murphy began as early as March 24, 2014. Yet, the district court held multiple hearings prior to the hearing on Murphy's motion to withdraw in which Holloway could have informed the district court of his displeasure with Murphy's representation. Recall, Holloway represented to the district court on June 3, 2014 that he "trust[ed] the direction that" Murphy was taking and that he and Murphy were "all good."

Third, we consider whether the conflict between Holloway and Murphy was so great as to result in a total breakdown of communication precluding an adequate defense. Romero, 215 F.3d at 1113. Specifically, Holloway argues that: (1) Murphy's motion to withdraw indicated that his judgment was "suspect"; (2) Murphy repeatedly sought to have him declared incompetent; and (3) Murphy's belief that he was incompetent controlled Murphy's approach to the case and usurped his right to determine the objective of his case.[7] None of Holloway's arguments cause us to conclude that any conflict between Holloway and Murphy was so great as to result in a total lack of communication precluding an adequate defense.

Conflict that results in a total breakdown of communication exists where the defendant and counsel could not, in any manner, communicate. See, e.g., Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970) (holding that when a defendant and his counsel did not communicate because of an "embroiled . . . irreconcilable conflict" the defendant was "deprive[d] . . . of the effective assistance of . . . counsel . . . ."). A total breakdown can also exist where the defendant and counsel are embroiled in a "stormy [relationship] with quarrels, bad language, threats, and counter-threats." United States v. Williams, 594 F.2d 1258, 1260 (9th Cir. 1979); but see United States v. John Doe No. 1, 272 F.3d 116, 124 (2d Cir. 2001) (concluding that while the

---

[7] Holloway also pointed to the fact that Murphy learned that he retained private counsel from the government. Because that fact relates to Holloway's actions, *not* Murphy's, we address this argument under the final Romero factor— "whether the defendant substantially and unreasonably contributed to the breakdown in communication." Romero, 215 F.3d at 1113.

16

relationship between defendant and counsel "was at times intense as a result of [defendant's] violent and aggressive nature, the conflict between the two was not 'so great that it . . . resulted in total lack of communication preventing an adequate defense.'" (quoting United States v. Simeonov, 252 F.3d 238, 241 (2d Cir. 2001)).

Meanwhile, certain contacts between a defendant and counsel can establish that no complete breakdown in communication occurred. For example, in United States v. Lott ("Lott II"), 433 F.3d 718, 721 (10th Cir. 2006), Lott's counsel did not provide Lott with any discovery and never visited Lott in jail. Yet, we concluded "there was not a lack of communication precluding an adequate defense" because: (1) counsel met with Lott and his probation officer in person to prepare the PSR; (2) counsel had a policy permitting his clients to call him collect from jail at any time, Lott was aware of that policy, and Lott made at least one call to counsel; (3) counsel sent Lott letters, "including one attaching a copy of the PSR and asking for comments or corrections;" and (4) counsel met in person with Lott in a holding area before sentencing. Id. at 725; see also United States v. Vaughan, 119 F. App'x 227, 231 (10th Cir. 2004) (unpublished disposition cited only for its persuasive value) (concluding that the third Romero factor was not satisfied when counsel argued for their client at sentencing).

In this case, Holloway claims that Murphy's description of his judgment as "suspect" evinces the "adversarial divide" between them. The statement arose in Murphy's motion to withdraw in response to prosecutors' claims that Holloway requested a change of counsel in a "last-minute, desperate attempt to manipulate the

17

legal system." Murphy replied, "[t]hat seems unnecessarily harsh. It will suffice to respond that defendant Holloway's judgment is suspect."

Referring to Holloway's judgment as "suspect" is not the type of egregious conduct in which a presumption of prejudice arises under Cronic. See, e.g., Turrentine v. Mullin, 390 F.3d 1181, 1208 (10th Cir. 2004) ("This Court has repeatedly found the Cronic presumption inapplicable where counsel actively participated in all phases of the trial proceedings." (internal quotation marks omitted)); United States v. Coleman, 835 F.3d 606, 612 (6th Cir. 2016) ("[T]he presumption of prejudice applies only in limited, egregious circumstances . . . ." (internal quotation marks omitted)). Indeed, that comment tells us nothing about the relationship between Holloway and Murphy except that Murphy contested the government's negative characterization of his client's motives. Accordingly, we conclude this lone statement by defense counsel does not evince a "severe and pervasive" conflict. Lott I, 310 F.3d at 1249.

Holloway also argues that his counsel's focus on competency shows a conflict resulting in a total breakdown in communication. In United States v. Boigegrain, 155 F.3d 1181, 1187 (10th Cir. 1998), we held that "[t]he Sixth Amendment . . . [does] not require that [a] public defender adhere to the defendant's apparent wish to avoid the competency issue." "[W]hen a lawyer has reason to believe that her client may not be mentally competent to stand trial, she does not render ineffective assistance of counsel by making her concerns known to the court." Id. This is because "[t]he Constitution prohibits a court from trying defendants who are mentally incompetent."

18

Id. at 1188 (citing Pate v. Robinson, 383 U.S. 375, 378 (1966)). And "[d]efense counsel is often in the best position to determine whether a defendant's competency is questionable." Bryson v. Ward, 187 F.3d 1193, 1201 (10th Cir. 1999), cert. denied, 529 U.S. 1058 (2000). Thus, "the defendant's lawyer is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them, she has a professional duty to do so when appropriate." Boigegrain, 155 F.3d at 1188.

Here, Murphy had reason to believe that Holloway might not have been mentally competent to stand trial. Dr. Bone's evaluation concluded that Holloway was competent; yet, his supplemental evaluator memorandum expressed his belief "that [Holloway] is likely compromised with regard to judgment, decision-making, and assisting properly in his defense." But unlike the evaluation, the supplemental evaluator memorandum arose out of a meeting between Dr. Bone, Holloway, and Murphy. The meeting's purpose was to discuss Dr. Bone's findings from the initial evaluation. The purpose was *not* to reevaluate Holloway. Yet after that meeting, Dr. Bone provided the supplemental evaluator memorandum, in which he described a renewed concern for Holloway's competency to stand trial.

After receiving the supplemental evaluator memorandum, Murphy appropriately raised Holloway's competency with the district court in order to seek an additional opinion. And while Holloway criticizes his counsel's attempts to have him declared incompetent, he indicated that he understood the purpose of his

19

evaluation was to determine if he could form the requisite intent to defraud the victims.

Holloway also asserts that Murphy's intent-based defense usurped his ability to control the objective of his case. But strategic disputes do not establish conflicts that support total breakdown in communication claims. United States v. Hutchinson, 573 F.3d 1011, 1025 (10th Cir. 2009) ("'strategic disagreement[s],' while no doubt unhelpful to a productive working relationship, are 'not sufficient to show a complete breakdown in communication.'" (alteration in original) (quoting Lott II, 433 F.3d at 725)); Lott I, 310 F.3d at 1249 ("Good cause for substitution of counsel consists of more than a mere strategic disagreement between a defendant and his attorney . . . rather there must be a total breakdown in communications." (internal citation omitted)); cf. Hale v. Gibson, 227 F.3d 1298, 1323 (10th Cir. 2000) (concluding that Cronic was not implicated where counsel "made a reasonable strategic decision to concede some involvement by Hale, given the overwhelming evidence presented at trial, and focused on the extent of his involvement and whether others could have been involved"). And defenses pursued (or not pursued) at trial are quintessentially strategic decisions. Gonzalez v. United States, 553 U.S. 242, 248 (2008) ("[D]ecisions by counsel are generally given effect as to what arguments to pursue . . . ."); Anderson v. Attorney Gen. of Kan., 425 F.3d 853, 859 (10th Cir. 2005) ("Whether to raise a particular defense is one aspect of trial strategy . . . .").

Here, Holloway expressly represented to Murphy that he wanted to contest the intent element of the wire fraud charges against him. Indeed, Holloway asked

Murphy to convince the jury that he "did not intent[ionally] mislead any investor."

Because Holloway sanctioned a defense based on intent, we are not convinced that

Murphy "usurped" his ability to define the objective of his defense.[8]  Accordingly,

Murphy's pursuit of an intent-based defense at trial does not support a complete

breakdown of communication claim.

Finally, we consider whether Holloway "substantially and unjustifiably

contributed to the breakdown in communication." Romero, 215 F.3d at 1113.  "A

defendant cannot simply manufacture a breakdown in communication and thereby give

rise to a constitutional violation." Id. at 1114.

Holloway contends no evidence exists that his actions contributed to the strained

communication with counsel, but the record is to the contrary.  As Holloway points out,

Murphy heard about his retention of private counsel from prosecutors, not from

---

[8] In McCoy v. Louisiana, 138 S. Ct. 1500, 1508–11 (2018), the Supreme Court held that a defendant has an autonomy right (i.e., the "[a]utonomy to decide . . . the objective of the defense") to assert actual innocence, and where counsel has violated that right, no showing of prejudice is necessary.  Unlike ineffective assistance of counsel jurisprudence, "a client's autonomy, not counsel's competence, is in issue." Id. at 1510–11.  "These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." Id. at 1508 (emphases in original).  Holloway relies on McCoy to suggest that counsel usurped Holloway's right to determine the objective of his defense.

Clearly McCoy permits a free-standing autonomy claim.  But Holloway did not present that claim to the district court and the district court did not grant a COA for such a claim.  Further, the Supreme Court recognized in McCoy that the disputes there "were *not* strategic disputes about whether to concede an element of a charged offense." Id. at 1510 (emphasis added).  Meanwhile, the disputes here *are* strategic disputes.  And as noted above, Holloway expressly requested his counsel attack the intent element of the government's case against him.

21

Holloway himself. Holloway *chose* not to communicate directly with Murphy about an issue that directly affected his representation. Indeed, Holloway stopped taking Murphy's calls and limited their communication to email. This undoubtedly contributed to a tense relationship. Finally, much of Holloway's hostility is attributable to the competency proceedings, which, as we just concluded, counsel had an obligation to pursue.

In sum, we conclude that the Romero factors do not support Holloway's contention that he suffered a complete breakdown in communication with Murphy that rendered his representation ineffective.

B.

Holloway also argues that his counsel's failure to object to a six-level sentencing enhancement for 250 or more victims under U.S.S.G. § 2B1.1(b)(2)(C) deprived him of effective assistance of counsel. As we explained in Holloway's direct appeal,

> The [district] court calculated Mr. Holloway's Guideline range as 188 to 235 months and sentenced him to a term of imprisonment of 225 months. Part of that calculation came from a six-level enhancement that applies if a crime "involved 250 or more victims." U.S.S.G. § 2B1.1(b)(2)(C) (2014). A victim was defined as "any person who sustained any part of the actual loss," § 2B1.1 n.1, and "actual loss" was defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. at n.3.

Holloway, 826 F.3d at 1250.

In applying the enhancement, the district court appears to have extrapolated from the testimony of seven witnesses that the number of victims exceeded 250. Holloway contends these witnesses' testimony did not establish by a preponderance of the evidence

the existence of 250 or more victims.  Because Holloway believes his counsel overlooked this objection, he contends his counsel provided ineffective assistance.

We evaluate ineffective assistance of counsel claims using the framework provided in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a defendant "must show both that his counsel's performance 'fell below an objective standard of reasonableness' and that 'the deficient performance prejudiced the defense.'"  Byrd v. Workman, 645 F.3d 1159, 1167 (10th Cir. 2011) (emphasis omitted) (quoting Strickland, 466 U.S. at 687–88).  "Courts are free to address these two prongs in any order, and failure under either is dispositive."  Id. at 1168.

"[O]ur review of counsel's performance under the first prong of Strickland is a 'highly deferential' one."  Id. (quoting Hooks v. Workman, 606 F.3d 715, 723 (10th Cir. 2010)).  We employ "a strong presumption that counsel provided effective assistance."  United States v. Kennedy, 225 F.3d 1187, 1197 (10th Cir. 2000).  To be constitutionally deficient, counsel's performance "must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'"  Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995)).  Indeed, "we start by presuming, absent a showing to the contrary, that an attorney's conduct is objectively reasonable because it could be considered part of a legitimate trial strategy."  Bullock v. Carver, 297 F.3d 1036, 1047 (10th Cir. 2002).  The defendant bears the "heavy burden" of overcoming that presumption.  Fox v. Ward, 200 F.3d 1286, 1295 (10th Cir. 2000).  And "the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable

23

professional assistance.'" Burt v. Titlow, 571 U.S. 12, 23 (2013) (alteration in original) (quoting Strickland, 466 U.S. at 689).

Here, Holloway failed to establish that his counsel was constitutionally ineffective. Holloway correctly asserts that: (1) testimony at trial established that US Ventures had at least 363 investors; (2) the government's case-in-chief only included the testimony of seven investors who testified to their losses during the scheme; and (3) no testimony was presented during trial or at sentencing regarding the specific number of investors who were made whole before the scheme ended.[9] But Holloway has not overcome the strong presumption that, under all the circumstances, the challenged action "*might* be considered sound trial strategy." Strickland, 466 U.S. at 689 (emphasis added); cf. Lott v. Trammell, 705 F.3d 1167, 1186 (10th Cir. 2013) ("Appellant must demonstrate . . . that the challenged action could not be considered sound trial strategy."). Indeed, Holloway does not even advance an argument in this regard.

The strong presumption in favor of attorney competence assumes that counsel makes a strategic evaluation after considering the relevant costs and benefits of certain actions. Here, while Holloway's argument is colorable, the case law is not settled in this Circuit. In other contexts we have approved reasonable estimates during sentencing. See, e.g., United States v. Dalton, 409 F.3d 1247, 1251 (10th Cir. 2005) ("[W]hen the actual drugs . . . are not seized, the trial court may rely upon an estimate to

---

[9] We also note that an individual is not a "victim" who suffered an "actual loss" under § 2B1.1(b)(2) if the individual is "fully and timely reimbursed." See United States v. Orr, 567 F.3d 610, 616 (10th Cir. 2009).

establish the defendant's guideline offense level so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability." (internal quotation marks omitted)).  But we have not addressed this type of extrapolation.  Other circuits have reached different conclusions in analogous circumstances.  Compare United States v. Savarese, 686 F.3d 1, 16 (1st Cir. 2012) (affirming a district court that determined that ten or more credit card companies were victims under U.S.S.G. § 2B1.1(b)(2)(A) because: (1) the co-conspirators executed fraudulent transactions on 107 credit cards, which each resulted in actual loss to the financial institution that issued that card; (2) most credit cards were destroyed after use, but 23 were issued by five different institutions; (3) there was additional evidence that a sixth issuer was harmed), with United States v. Brown, 771 F.3d 1149, 1160 (9th Cir. 2014) (rejecting the argument that "the district court could determine that 100 [out of 405] victims had their financial security substantially endangered solely by extrapolating from the 27 out of 29 victim impact statements provided to it").  Thus, the benefits of objecting were unclear.

Furthermore, an objection could have harmed Holloway.  At sentencing, Murphy sought leniency from the district court, imploring it to depart from the Guideline range to account for Holloway's mental proclivities.[10]  An objection could have resulted in additional evidence regarding individual victims, which counsel could have reasonably

---

[10] The parties did not include the sentencing transcript in the record on appeal. Nevertheless, we take judicial notice of district court filings.  See United States v. Smalls, 605 F.3d 765, 768 n.2 (10th Cir. 2010) (taking judicial notice of district court record that was not part of the record on appeal).

believed would reduce the likelihood of leniency. Accordingly, we conclude that Holloway failed to overcome the presumption that his counsel's actions were strategic. See Hanson v. Sherrod, 797 F.3d 810, 829 (10th Cir. 2015) ("[W]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." (quoting Yarborough v. Gentry, 540 U.S. 1, 8 (2003)).

Nevertheless, Holloway argues that "a valid sentencing challenge overlooked by trial counsel satisfies both prongs of the Strickland analysis." In support, Holloway relies on United States v. Kissick, 69 F.3d 1048 (10th Cir. 1995) and United States v. Glover, 97 F.3d 1345 (10th Cir. 1996). Neither case persuades us that Holloway's counsel was ineffective.

In Kissick, defense counsel "fail[ed] to challenge the use of a prior conviction to classify the defendant as a career offender when that prior conviction [was] *facially insufficient*" to satisfy the requirements for the career offender classification. Kissick, 69 F.3d at 1056 (emphasis added). There, we concluded that counsel's failure to object satisfied the deficient performance prong under Strickland. Id. Similarly, in Glover we held that "[w]hen counsel has unwittingly relieved the government of its burden of proof, particularly when the evidence of record does not satisfy that burden, it is fair to say counsel has 'so undermined the proper functioning of the adversarial process that [it] cannot be relied on as having produced a just result.'" Glover, 97 F.3d at 1349 (alteration in original) (footnote omitted) (quoting Strickland, 466 U.S. at 686). But we emphasized

26

that the sentencing "issue counsel failed to raise was *clearly meritorious*." Id. (emphasis added).

In both Kissick and Glover, counsel failed to raise clearly meritorious arguments and there was no indication that the defendant could have been prejudiced if counsel objected. Here, the objection was not a clear winner and could have prejudiced Holloway. Thus, counsel's failure to object to the number of victims is reasonably attributable to sentencing strategy. For those reasons, we are not persuaded that either Kissick or Glover dictate our resolution of Holloway's claim.

Accordingly, Holloway failed to carry his burden with respect to this claim.

IV.

Finally, Holloway argues that the prosecution violated his due process rights by failing to turn over evidence in the receiver's possession. Holloway seeks all the documents in the receiver's possession. The district court construed this claim as a Brady violation and denied relief.

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. To establish a Brady violation, the defendant bears the burden of establishing that: the prosecution suppressed evidence; the evidence was favorable to the accused; and the evidence was material. Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 824 (10th Cir. 1995). The "prosecution" includes "not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, as well as . . . other arms of the

27

state involved in investigative aspects of a particular criminal venture." <u>Smith</u>, 50 F.3d at 824 (internal citation and footnote omitted).

Holloway contends that the receiver was a member of the prosecution team, and thus the prosecution had a duty to ask the receiver to provide it with all exculpatory and material documents.[11] "A <u>Brady</u> claim fails if the existence of favorable evidence is merely suspected." <u>United States v. Erickson</u>, 561 F.3d 1150, 1163 (10th Cir. 2009). The defendant bears the burden of establishing that the evidence exists. <u>Id.</u> Here, Holloway's <u>Brady</u> violation fails because he does not even *attempt* to argue that the documents in the receiver's possession are favorable to him. Indeed, he claims he cannot evaluate favorability because he has not seen the receiver's documents. Speculation is insufficient to establish favorability under <u>Brady</u>. <u>United States v. Acosta-Gallardo</u>, 656 F.3d 1109, 1117 (10th Cir. 2011) (concluding that the defendant failed to establish favorability under <u>Brady</u> where "no one knows whether the results [of the fingerprint analysis] would have been favorable" to the defendant); <u>Sandoval v. Ulibarri</u>, 548 F.3d 902, 915 (10th Cir. 2008) (explaining that the defendant had the burden to establish "his

---

[11] The district court concluded that the receiver did not fall within the prosecution team because he was an officer of the court. <u>Holloway</u>, 2018 WL 1831835, at *4. We have not addressed whether a court-appointed receiver can be a member of the prosecution team for <u>Brady</u> purposes. Because we resolve this issue on other grounds, we do not reach that question.

[Brady] theory was more than speculation"). Here, Holloway offers even less than speculation. Thus, Holloway's Brady claim necessarily fails.[12]

We note that Holloway seeks access to all the documents in the receiver's possession. To the extent this request may be construed as a discovery motion, we conclude that he waived the argument. See Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived."). Holloway's briefing referenced only a Brady violation, made no mention of discovery, and did not cite the proper standard for discovery in § 2255 proceedings. See Rule 6(a) of the Rules Governing Section 2255 Proceedings. Indeed, neither party briefed the issue of whether Holloway is entitled to discovery in the § 2255 context to the district court or on appeal. Accordingly, Holloway waived any argument for discovery.

AFFIRMED.

---

[12] As to materiality, "[u]nder Brady, evidence is material if it creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." United States v. Acosta-Gallardo, 656 F.3d 1109, 1117 (10th Cir. 2011) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Scott v. Mullin, 303 F.3d 1222, 1230 (10th Cir. 2002).

Holloway fails to allege that the documents are material. But, even if he had, at trial the prosecution presented overwhelming evidence of Holloway's guilt, including Holloway's own emails describing his operation of US Ventures as a "Ponzi deal." We doubt that any documents in the possession of the receiver would undermine our confidence in the outcome of the case, particularly because Holloway's defense strategy focused on his mental culpability, not on whether he was engaged in the underlying conduct itself.